

**FILED**

Aug 18 2016, 8:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of:<br>A.H. (Minor Child), Child in Need of Services,<br><br>and<br><br>A.H. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | August 18, 2016<br><br>Court of Appeals Case No.<br>49A04-1601-JC-42<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br>The Honorable Rosanne T. Ang, Magistrate<br><br>Trial Court Cause No.<br>49D09-1507-JC-2165 |

**Baker, Judge.**

[1] When a parent is unwilling or unable to provide help to his or her child, Indiana's Department of Child Services can seek the "coercive intervention" of a court to compel that parent to provide help through a Child in Need of Services (CHINS) adjudication, but this intrusion of the coercive power of the State into family life is "reserved for families who *cannot* meet those needs without coercion—not those who merely have *difficulty* doing so." *In re S.D.*, 2 N.E.3d 1283, 1285 (Ind. 2014). Nor is that power appropriately applied to a parent who seeks reasonable care for her traumatized child, merely because that care is ultimately unsuccessful through no fault of the parent.

[2] A.H. (Mother) appeals the juvenile court's order finding her daughter, also initialed A.H. (Child), to be a CHINS. Mother argues that the evidence is insufficient to support the CHINS adjudication. Finding no evidence that the coercive power of the court is necessary to ensure Child receives care, we reverse.

## Facts

[3] Child has had a difficult past. She was bullied in school for being interracial. The bullying became so serious that she was admitted to a psychiatric hospital. At fourteen years old, she became pregnant, and when she was eight months pregnant, she was raped. As a result of these traumas, Child slept poorly and was often violent. Police were called to the house several times, and Child was arrested on some of these occasions. She has been diagnosed with anxiety

disorder, separation anxiety, and depression. Mother has taken Child to receive mental health care since Child was in fifth or sixth grade.

[4] In June 2015, the Indiana Department of Child Services (DCS) became involved with the family when it received a report that Child had struck her brother. A family case manager (FCM) spoke to Mother, but Child refused to speak to the FCM. Mother informed the FCM that she had been taking Child to mental health service providers but that Child refused to participate in the services.

[5] On July 14, 2015, DCS filed a petition alleging that Child was a Child In Need of Services (CHINS) because her "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision." Appellant's App. p. 26. That same day, the juvenile court held an initial hearing on the petition. Mother was not present, as DCS had not yet served her. Along with ordering continued in-home placement of Child, the juvenile court ordered therapy and a psychological evaluation for Child, and ordered "DCS to staff the matter for possible services through Cross Systems of Care." *Id.* at 38-39.

[6] At the next hearing, two weeks later, DCS still had not served Mother, and still had not arranged any services. The juvenile court noted, "Mother is willing to participate in services." *Id.* at 44. It also "order[ed] DCS to ensure that the

services ordered at the initial hearing be arranged for the family by the end of today." *Id.* at 44-45. Another hearing was set for a week later.

[7] At that next August 4, 2015, hearing, DCS still had not arranged a psychological evaluation. So again, the juvenile court "order[ed] DCS to ensure that services that were ordered at the last hearing [are] in place." *Id.* at 57. At the next hearing on August 18, DCS still had not made the referral for a psychological examination. At the next hearing on August 25, DCS still had not arranged a psychological evaluation, but told the juvenile court that it "will be in place soon." *Id.* at 66. The juvenile court "admonishe[d] DCS for not having the referral for the psychological evaluation for [Child] in place [and] order[ed] that DCS have the psychological evaluation . . . in place for [Child] within 48 hours." *Id.* DCS, however, did not comply with this order either.

[8] On September 2, Child became violent with her sister. Mother called the police and asked them to take Child to the hospital, where Mother hoped a psychological evaluation could be completed. DCS eventually referred Mother to an organization named Damar for a mental health evaluation. However, when Mother followed up on DCS's referral, Damar informed her that it only works with mentally handicapped persons, not mentally ill persons, and does not perform mental health evaluations.

[9] The first psychological evaluation of Child began at her home on September 14, 2015, by Midtown Mental Health. Midtown required a second evaluation. When Midtown sent out a representative on October 14, 2015, however, that

individual did not have the training required to complete the evaluation, and so left. No one from Midtown contacted Mother again. A psychological evaluation was finally completed in November 2015 by Caring Associates in Brownsburg. Because of DCS's four-month delay from the initial court order, the results of the evaluation were not available at the time of the November 16 and 23 fact-finding hearing.

[10] At that hearing, several witnesses, including Mother, told the juvenile court that Child was benefitting from therapy. At the conclusion of the hearing, the juvenile court adjudicated Child a CHINS. The juvenile court did not make a written set of findings, but ended the hearing by saying the following:

- Mother is not unwilling to provide for Child's needs
- "but the statute also says unable and I do think that you've been unable for whatever reason to get the help that your daughter needs"
- "we're talking about violent outburst, whether it's you, other adults who live in the home."
- "Your own stated words as far as how [Child] would be as a mother[1] if she did not get help"
- Child "has a lot of issues and when I hear that she has been displaying issues since she was in the fifth or sixth grade to allow that much time to pas[s] for us not to get the help she needs that is an issue"
- Child's therapist "has made some headway in [getting Child to open up therapeutically] and that is something that even you've admitted"
- "The condition of this child is that she needs the help that we're trying to offer, that [Mother] you in fact are saying that you would like for her to get and so while I understand why these proceedings become adversarial at times I don't think we have that different of a goal."

---

[1] Child has a son, who has been adjudicated a CHINS. Child's son is not part of the present case.

- "This isn't something that's done immediately and so I think services still need to remain in place and they are going to remain in place."

Tr. p. 258-60.

[11] At a subsequent dispositional hearing in December 2015, DCS informed the juvenile court that Mother was doing everything she could to get help for Child. DCS explained that progress was held up because Child "really doesn't want the help." *Id.* at 268. The juvenile court entered its dispositional order on December 15, 2015, and Mother now appeals.[2]

# Discussion and Decision

[12] Initially, we note that, as part of her appeal, Mother has challenged a January 12, 2016, juvenile court order issued after a periodic review hearing. At that hearing, DCS recommended that the CHINS case be closed, since Child would turn eighteen years old the following day. Both parents agreed. Nevertheless, the juvenile court denied that request. That order, however, was issued after the dispositional order that is currently being appealed, and is therefore not properly before us.

---

[2] In Mother's reply brief, she contends that a portion of DCS's brief is not supported by the record, and finishes by saying, "This portion of Appellee's Brief should be stricken because DCS fails to cite to the transcript or Appendix or offer other support for those propositions." Appellant's Reply Br. p. 8. DCS took this to be a motion to strike, to which it responded with a motion in opposition. We understand Mother's sentence to be a rhetorical device to critique DCS, not a formal motion, and therefore decline to issue any ruling on this matter.

[13]   Mother also argues that the evidence is insufficient to support the juvenile court's CHINS finding. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*
>
> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253–54 (Ind. 2012) (footnote omitted).

[14]   Here, DCS alleged that Child was a CHINS pursuant to Indiana Code section 31–34–1–1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Because the juvenile court did not adopt formal findings, we review this case under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[15] We find our Supreme Court's decision in *S.D.* to be instructive. In that case, a single mother of five children struggled to care for two-year-old S.D., who had severe health problems. *S.D.*, 2 N.E.3d at 1285. S.D. required special medical care, and hospital policy would not allow her to rejoin her mother until her mother found a second caregiver and completed training to deal with S.D.'s

condition. *Id.* at 1286. DCS acknowledged that the mother had "done a lot," but it sought the CHINS adjudication because she "received a lot of help and she still needs a lot of help." *Id.*

[16] Our Supreme Court reversed the CHINS adjudication, focusing particularly on the "most critical[]" element: whether the care was "unlikely to be provided or accepted without the coercive intervention of the court." *Id.* at 1287; I.C. § 31-34-1-1(2)(B). The Court concluded that the evidence did not show "that she would be unable to correct her one lingering issue without the 'coercive intervention of the court.' DCS's desire to help this struggling family was understandable, but the facts simply do not justify subjecting this family to State compulsion." *Id.* at 1285.

[17] Likewise, in this case, we can find no evidence in the record to support a finding that Mother would not provide care to Child without the coercive intervention of the court. At the fact-finding hearing, the juvenile court itself told Mother "I don't think you are unwilling . . . to get help." Tr. p. 258. It also conceded, "I understand that you can't make a seventeen year old talk to someone, that therapeutically you can't make her open [up]." *Id.* at 259. It acknowledged, "DCS can't make, wave a magic wand and help your child immediately any more than potentially what you could have and so long term this is a long road." *Id.* at 260.

[18] Instead, in making the CHINS adjudication, the juvenile court focused on a particular word of the statute: "the statute also says unable and I do think that

you've been unable for whatever reason to get the help that your daughter needs." Tr. p. 257.

[19] But the statute does not simply say "unable," it focuses on a parent's "inability, refusal, or neglect . . . *to supply* the child with necessary food, clothing, shelter, medical care, education, or supervision." I.C. § 31-34-1-1(1) (emphasis added). There is no evidence in the record that Mother failed "to supply" Child with the help she needs; there are no missed appointments with a therapist, there are no services Mother refused, there are no medications that Mother was unable to provide.

[20] We understand DCS's and the juvenile court's frustration that Child has not yet recovered from the unimaginable traumas that she suffered. But unless this lack of recovery is attributable to some action or omission by Mother, the lack of recovery alone cannot support a CHINS determination.

[21] To make a simple analogy: if a child is sick, and his parents take him to every scheduled doctor's appointment, but the doctors are unable to cure the child's disease, the child's continued illness clearly could not support a CHINS adjudication. And yet, according to the record before us, that is essentially what has happened in this case. As Mother argued to the juvenile court:

> How can you [adjudicate Child a CHINS] when I have done everything to get my child some help and because counselors, the juvenile system, everything has not been able to do anything then that's placed on me? . . . I took my daughter to a rape center, they wouldn't help her. I've taken my daughter to other places, they wouldn't help her . . . As a rape victim they said the first

thing you have to do for a child is to be patient. I am doing everything that I've been ordered to do and what I know I need to do to help her.

Tr. p. 261.

[22] The CHINS adjudication is particularly troubling in this case, given DCS's inexcusable lack of diligence in referring Child for a psychological evaluation. The juvenile court ordered DCS to refer Child for an evaluation on July 14, 2015. DCS did not do so. It then failed to comply with at least four additional court orders to refer Child for an evaluation. The delay lasted for so long that the results of the evaluation were not ready at the fact finding hearing four months later. For DCS to fail to refer Child to a psychological evaluation, for four months and despite multiple court orders, and then to pursue a CHINS petition in which it claims that Mother was unable to supply Child with medical care, is simply indefensible. Moreover, we question why the juvenile court put absolutely no consequences in place for DCS's repeated failures to comply with court orders. DCS should not be permitted to violate court orders with impunity.

[23] All of the evidence in the record, including the informal findings of the juvenile court, show that Mother is willing and able to engage with all needed services on behalf of Child. Since this is the case, there is insufficient evidence that medical care "is unlikely to be provided or accepted without the coercive intervention of the court." I.C. § 31-34-1-1(2)(B).

[24] The judgment of the juvenile court is reversed and remanded with instructions to vacate the CHINS adjudication.

Najam, J., concurs.
Vaidik, C.J., concurs in result.