## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 24 2017, 10:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of Al.W. and As.W. (Minor Children), Children in Need of Services,

and

J.W. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 24, 2017

Court of Appeals Case No. 49A02-1705-JC-1078

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Diana J. Burleson, Magistrate

Trial Court Cause Nos. 49D09-1611-JC-4321 49D09-1611-JC-4322

**Bailey, Judge.**

# Case Summary

[1] Following fact-finding and dispositional hearings and orders, J.W. ("Mother") appeals[1] the trial court's order adjudicating her children, Al.W. and As.W. (collectively, "the children"), to be Children in Need of Services ("CHINS"). She raises three issues on appeal, which we consolidate and restate as the following issue: whether there was sufficient evidence to support the determination that the children are CHINS. We hold that there was not; therefore, we reverse.

# Facts and Procedural History

[2] Mother and Father (collectively, "the parents") were married and had two children, Al.W., born December 22, 2008, and As.W., born August 19, 2010. The parents divorced at some point, and Mother was awarded legal custody of the children.

[3] On November 15, 2016, the Indiana Department of Child Services ("DCS") received a report alleging that Father was using and selling methamphetamine in the family's home, and that child Al.W. was having behavioral issues in school, but the school was unable to reach his parents. Marion County DCS Family Case Manager ("FCM") Sarah Stuckey ("FCM Stuckey") conducted an assessment of the allegations. Mother informed FCM Stuckey that Mother had

---

[1] Je.W. ("Father") does not participate in this appeal.

turned off her cellular phone while at the dentist's office and that is why the school was initially unable to reach her regarding Al.W.'s behavior that day. Appellant's App. at 38. Mother stated that she had called the school that day, as soon as she had been able to turn her cellular phone back on and retrieve the school's message. *Id*. Mother also stated that she and the children were living in the Indianapolis home of Kimberly Kepley ("Kepley"), the children's paternal grandmother, so that Mother could care for Kepley, who was ill.

[4] Both Mother and Father informed FCM Stuckey that Father did not live in Kepley's house with Mother and the children. FCM Stuckey visited Mother's home and found it appropriate. Mother stated that she had used drugs in the past, but had not used drugs in over one year. Mother agreed to take a drug screen, and the results were negative for drug use. Mother told FCM Stuckey that Mother suspected Father still used drugs and that, for that reason, Mother did not allow Father to visit with the children unsupervised. Mother stated that she had mental health diagnoses of Bipolar Disorder and Post-Traumatic Stress Disorder, but was not seeking treatment at that time. Mother also stated that Al.W. had been diagnosed with depression and Attention Deficit Hyperactivity Disorder ("ADHD"), for which he took medication and saw a therapist. Mother told FCM Stuckey that Al.W. was no longer receiving school-based services for his mental health issues because she "was told the services were overlapping" with the services he received outside of school. *Id*. at 38.

Father told FCM Stuckey that he no longer used drugs. However, Father refused to take a drug screen because he said the results would be positive for marijuana and methamphetamine.

On November 21, Mother informed FCM Stuckey that Mother and the children had to leave Kepley's home because Kepley had been hospitalized and was not expected to recover. Mother informed FCM Stuckey that Mother and the children were moving in with Brenda Hoskins ("Hoskins"), the children's maternal grandmother, in Anderson, Indiana.

On November 23, DCS filed a petition alleging the children were CHINS pursuant to Indiana Code Section 31-34-1-1 based upon allegations that:

> a. [Mother and Father], parents of [Al.W.] and [As.W.], have failed to provide the children with a safe, stable, and appropriate living environment free from substance abuse.
>
> b. [Father] has been using illegal substances that seriously hinder his ability to care for the children.
>
> c. [Father] smokes marijuana and uses methamphetamine.
>
> d. In addition, [Mother] struggles with untreated mental health issues.
>
> e. [Mother] is diagnosed with bipolar and post traumatic stress disorder (PTSD) but is not currently receiving treatment.
>
> f. [Mother] is a recovering heroin addict but has reportedly been clean for over a year.

g. [Al.W.] has been exhibiting behavioral and/or mental health issues the parents have been unable to adequately address.

h. [Mother] also lacks stable housing.

i. The family has a history with the Department of Child Services (DCS), and services were previously offered through a Children In Need of Services (CHINS) action.

j. Due to the foregoing reasons, the coercive intervention of the Court is required to ensure the children's safety and well being.

Appellant's App. at 35. The petition noted that the children had not been removed from Mother's home.

[8] On November 25, DCS filed the report of FCM Stuckey's preliminary investigation which summarized her assessement findings. She noted that she had gone to Mother's home at Kepler's house and found it was appropriate, and would be visiting Mother's home at Hoskin's house to ensure the same. *Id.* at 38. She also noted that DCS had previous involvement with Mother and Father and the children due to the parents' past drug use. She reported that Al.W. "is currently prescribed Prozac and Zyprexa along with seeing a therapist to address his mental health needs." *Id.* at 43. She also stated:

[Mother] is aware of [Al.W.'s] mental health needs and is willing to accept DCS help to obtain more services for [Al.W.]. [Mother] has been up front with FCM Stuckey about her past drug use and is committed to remaining substance free now and in the future for the safety and well-being of her children. [Mother] is committed to continuing to ensure the safety of her

children, which included signing a safety plan stating she would ensure the children's basic needs are met, the home is free from drugs, the children attend school and all doctors' appointments, and[,] per her decision[, Father] would not be around the children unsupervised.

*Id*. at 43. The report recommended out of home placement for the children "if [Mother] cannot maintain [Al.W.'s] mental health treatment or comply with services." *Id*. DCS also filed a notice of placement change, noting that, effective November 23, the children were living with Mother at Hoskins' home in Anderson.

[9] On November 28, the trial court issued a detention order, following a hearing, in which it found that: the parents denied the CHINS allegations; removal of the children from the home was not necessary to protect them; the children should be under temporary supervision of DCS; and, the permanency plan was reunification with the parents. The court granted DCS wardship of the children and placed them with Mother who was living at Hoskin's house. The court ordered that Mother participate in home-based therapy and case management, and it ordered supervised visitation for Father. On December 5, the court held a pretrial hearing and ordered that the children's placement remain the same.

[10] On January 10, 2017, DCS filed a motion for another detention hearing on the grounds that, on or about December 19, Mother, without notifying DCS, had moved the children to the home of Robin Cook ("Cook"), the children's maternal grandfather, and DCS had "no knowledge as to Mother's whereabouts at [that] time." *Id*. at 74. On January 11, following a detention

hearing, the trial court issued a detention order in which it noted that DCS requested the children be placed with Cook, and it ordered the children removed from Mother's care and placed with Cook. *Id*. at 78, 80.

[11] On March 6, the trial court conducted a fact-finding hearing at which FCM Stuckey testified regarding the initial CHINS allegations and assessment. She testified that the CHINS allegations were that Father used and sold drugs in the family home and that Al.W. had been suspended from school but the school could not reach his parents. She testified she found, at the time of her assessment, that Father was not living in the home with the children and Mother; Mother's home was clean and appropriate; she had no evidence that Father had ever used drugs in front of the children; Mother had told her Father's visits with the children were supervised; and Al.W. was in therapy. She stated she was "concerned" that Al.W. was not receiving "all the possible services he could be receiving." Tr. at 47. However, FCM Stuckey completed a "311" assessment report in which she found that the CHINS allegations were substantiated for Father and unsubstantiated for Mother. *Id*. at 40-41. FCM Stuckey was no longer the family's FCM at the time of the fact-finding hearing, and she stated she could "not speak to the state of [Mother's] home" at the time of that hearing. *Id*. at 46.

[12] Madison County FCM Tyler Hammons ("FCM Hammons") testified that he was "assigned to an assessment" of the children's case in December 2016 based on allegations that the children "had been dropped off with their grandfather" in Anderson, and concerns "that the parents were not caring for the kids at that

time," and "concerns of ongoing drug use with both parents." *Id*. at 50. However, after conducting a home study of Cook's home, FCM Hammons had no safety concerns and found the December 2016 allegations were unsubstantiated. His office took no further action as to the children because there was an on-going CHINS case in Marion County.

[13] Marion County FCM Samantha Lewedag ("FCM Lewedag") testified that she was assigned as the FCM for the children's on-going CHINS case on January 6, 2017. The children were still living with Cook in Anderson. FCM Lewedag stated that Mother informed her on or around January 18 that Mother did not have a residence for herself and was looking into shelters. On approximately February 27, Mother informed FCM Lewedag that Mother was living with her brother's grandmother in Anderson. FCM Lewedag stated that DCS had not been able to assess Mother's new residence by the time of the hearing, but that Mother had told her DCS could assess the home that coming Friday, i.e., March 10, when the owner of the home had returned to town.

[14] FCM Lewedag was aware that Mother had an intake appointment with a mental health service provider, but that she had not received any other services there yet. FCM Lewedag was aware that Al.W. was on medications for his mental health problems and had a referral for an evaluation and therapy at Aspire, a mental health services provider. FCW Lewedag was not aware of what mental health services, if any, Mother or Al.W. had received before she took over the CHINS case, and she had not sought documentation from their prior service providers or Al.W.'s school. FCW Lewedag testified that she

believed the children required court intervention because, "to her knowledge," Mother did not "have transportation in order to get [Al.W.] to [mental health services] appointments." Tr. at 71.

[15] Mother testified that she had been required to move from her mother's house in December 2016 because Hoskins was an alcoholic who had suddenly demanded that Mother and the children leave the home. Mother immediately took the children to Cook's, her father's, home. However, because Cook did not have enough room for both Mother and the children, Mother left the children with Cook and stayed with a friend. Mother testified she did not have stable housing for herself until approximately February 6, when she moved in with her brother's grandmother. Mother testified that her current home was appropriate, the children had their own bedroom there, and her brother's grandmother had stated the children were welcome in the home. She testified that her brother's grandmother was out of town until that Friday and did not want DCS to come to her home until she could be there. Mother also testified that both she and Al.W. had received mental health services in the past and were currently receiving such services. And she testified that the children had remained in their same school in Anderson during the pendency of the CHINS action.

[16] At the close of evidence, Mother's and Father's attorneys each moved for judgment on the evidence on the grounds that DCS had failed to prove that the children were CHINS. The trial court denied those motions. Following closing arguments, the trial court stated:

I am going to find that the children are in need of services for one reason, and that is the housing situation. The testimony that I heard today even from [Mother] was that she's living with the brother's grandmother, but she even said that DCS was not allowed to come see the house. So even though DCS wanted to come see the house[,] or if they should have gone out to see the house[,] from what I heard from her testimony was that that was not going to be allowed until the grandmother or whoever [it] is that that lives there gets home. So there's been no verification that the house is … adequate and so based on that, that small little issue however small it may be it's still housing, it's still mother and father's ability to provide the children with a home to live in. So I will find that they are in need of services. Let's set it out for disposition. In the meantime, I will order DCS to get out to see the home.

Tr. at 87. The trial court also ordered that Mother have unsupervised visitation with the children. *Id*. at 90.

[17] In its written order on the fact-finding hearing, the trial court stated, in relevant part:

4. On or about November 23, 2016[,] DCS filed a petition alleging that the children were in need of services. The children were not removed from their mother's care.

5. In November 2016 [Mother] was living with her ex mother in law, but [Father] was not living there.

6. [Mother] left that home right before Thanksgiving because her ex mother in law was not coming home from the hospital.

7. [Mother] then stayed at her mother's home. Living there were [Mother], her mom, her brother and sister, and [the children].

8. [Mother] stayed with her mother for a month, and left because her mother is an alcoholic.

9. In December 2016 [Mother] then went to Robin Cook's, who is [Mother's biological father[2]]. He agreed to keep the boys but she could not stay.

10. A detention hearing was held on January 11, 2017[,] after DCS learned that [Mother had] left the children with Mr. Cook. A week after the detention hearing[,] the ongoing FCM, Ms. Lewedag, talked to [Mother] who said she was looking into shelters and did not have a place to live.

11. After [Mother] dropped [off] the boys in Mr. Cook's care, she stayed for a night with a friend.

12. [Mother] got word that her ex mother in law was about to pass away, so she stayed at the hospital for 2 nights until her ex mother in law passed away.

13. [Mother] has been living at her brother's grandmother's [house] for a month. FCM Lewedag learned last Friday that [sic] about this living arrangement.

14. [Mother] has not allowed the FCM to see the house because the grandmother is out of town, and won't be back until Friday, after which time the FCM can inspect the home and talk to the grandmother. DCS will have to run background checks on anyone living in the home.

---

[2] The trial court mistakenly stated Cook was the children's biological father; however, the evidence indicates, and the parties agree, that Cook was *Mother's* biological father.

15. The assessment worker spoke to [Father] on November 15, 2016. He denied using and selling drugs and refused a drug screen because he said the FCM was going to take the children. He said he would test positive for marijuana and methamphetamine.

16. [Mother] has been unable to provide stable housing for the children for the past 3 months; the children need that housing and it is unlikely to be available for the children without the coercive intervention of the court.

Appellant's App. at 94-96. The court ordered that the children remain in their current relative placement, i.e., with Cook. *Id*. at 98.

[18] On April 3, 2017, the parties convened for a dispositional hearing but agreed to continue it. On April 24, trial court held the dispositional hearing at which FCM Lewedag, Home-Based Case Manager Ashley Hutchinson ("Hutchinson"), and Mother spoke; however, no witnesses were sworn in at this proceeding. In its April 24 dispositional order, the trial court found "that it is in the best interests of the child[ren] to be continued removed [sic] from the home environment and remaining in the home would be contrary to the welfare of the child[ren] because: the allegations [were] admitted or found to be true." *Id*. at 29. The court ordered the children to remain under DCS's supervision and placed them in foster care. *Id*. at 29-30. The court ordered supervised visitation for both parents, home-based case management services for Mother, and random drug screens for Father. *Id*. at 31; Tr. at 114, 116. Mother now appeals.

# Discussion and Decision

## Standard of Review

[19]     The juvenile court adjudicated Al.W. and As.W. to be children in need of services pursuant to Indiana Code Section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[20]     In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility but consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *J.M. v. Ind. Dep't of Child Serv.* (*In re N.C.*), 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). When the trial court enters findings of fact and conclusions of law *sua sponte*, as the court did here, we apply a two-tiered standard of review to the issues covered by the findings:  we consider, first, whether the evidence supports the findings

and, second, whether the findings support the judgment. *In the Matter of S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014); Ind. Trial Rule 52(A).

[21] However, "we review the remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287. (quotation marks and citation omitted). Under the general judgment standard of review, the reviewing court "may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied*. In deference to the trial court's proximity to the issues, an appellate court will "disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *In re Guardianship of B.H.*, 770 N.E.2d 283, 287-288 (Ind. 2002) (quotations and citations omitted).

## Sufficiency of Evidence that Children are CHINS

[22] A CHINS adjudication under Indiana Code Section 31–34–1–1 requires three basic elements: "that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. That final element "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the ability to provide for their children, not merely where they encounter

difficulty in meeting a child's needs." *Id.* (quotation marks and citation omitted).

[23] Courts should consider the family's condition not only at the time the CHINS case was filed, but also when the case is heard at the fact-finding hearing. *Gr.J. v. Ind. Dep't of Child Serv.* (*In re D.J.*), 68 N.E.3d 574, 580 (Ind. 2017); *see also,* *E.B. v. Ind. Dep't of Child Serv.* (*In re Des.B.*), 2 N.E.3d 828, 836 (Ind. Ct. App. 2014) (quotation marks and citation omitted) ("A CHINS adjudication may not be based solely on conditions that no longer exist, but the court should consider the family's situation at the time the case is heard by the court."). DCS has the burden of proving by a preponderance of the evidence that the children are CHINS. *See, e.g.*, *J.J. v. Ind. Dep't of Child Serv.* (*In re K.S.*), 78 N.E.3d 740, 744 (Ind. Ct. App. 2017). DCS may not simply rely upon allegations; rather, it must gather the facts and the evidence to support its CHINS petition. *D.B. v. Ind. Dep't of Child Serv.* (*In re D.B.*), 43 N.E.3d 599, 606 (Ind. Ct. App. 2015).

[24] A CHINS designation "focuses on the child's condition rather than the parent's culpability." *In re K.S.* at 745 (citing *N.L. v. Ind. Dep't of Child Serv.* (*In re N.E.*), 919 N.E.2d 102, 105 (Ind. 2010)). "The purpose of a CHINS adjudication is to provide proper services for the benefit of the child, not to punish the parent." *Id.*

> To be a CHINS, a child must be seriously impaired or endangered "as a result of the inability, refusal, or neglect of the child's parent" to provide necessary care. Ind. Code § 31–34–1–1 (emphasis added). Children cannot become CHINS by the mere happenstance of a family's economic misfortune; the statute

requires an action or failure to act by the parent that leads to serious endangerment of the children as a result of the lack of necessary care. [*A.M. v. Ind. Dep't of Child Serv.*,] *In re S.M.*, 45 N.E.3d [1252,] 1256 [(Ind. Ct. App. 2015)] ("The mere fact of an unemployed parent does not make a CHINS. The mere fact of a family on food stamps does not make a CHINS. Even the mere fact of a family living in a shelter while seeking stable housing does not make a CHINS.").

*Ja.K. v. Ind. Dep't of Child Serv.* (*In re S.K.*), 57 N.E.3d 878, 883 (Ind. Ct. App. 2016).

[25] Here, the trial court based its CHINS determination solely on Mother's "housing situation." Tr. at 87. Specifically, the trial court noted that Mother's home at the time of the fact-finding hearing had not yet been assessed to determine if it was adequate and, "based on that … small little issue … [regarding] mother and father's ability to provide the children with a home to live in," it determined that both of the children were CHINS. *Id.* In its written findings, the court found as a fact that Mother "[had] been unable to provide stable housing for the children for the past 3 months." Appellant's App. at 96.

[26] The evidence does not support the trial court's findings regarding Mother's housing. The evidence showed that the children were in safe, appropriate housing at the time the CHINS petition was filed, during the pendency of the CHINS action, and at the time of the CHINS fact-finding hearing.[3] When the

---

[3] We note that the trial court took no evidence at the dispositional hearing, as it failed to swear in any of the people who spoke at that hearing. To the extent that means that the court failed to conduct a dispositional

CHINS petition was filed on November 23, 2016, Mother and the children were living with Hoskins, Mother's mother, in Anderson. At the November 28 detention hearing, DCS recommended, and the trial court ordered, that the children remain with their Mother at Hoskins' home, thus indicating the placement was appropriate. When the children could no longer stay in Hoskins' home through no fault of Mother, Mother found the children a safe, appropriate home to live in with her father, Cook. FCM Hammons did a home study of Cook's home and found that it was safe. And, again, at the fact-finding hearing DCS recommended, and the trial court ordered, that the children remain in Cook's home. Thus, the children were in safe, appropriate housing during the entire time of this CHINS action, including the time of the fact-finding hearing. The court's findings to the contrary are not supported by the evidence.

[27] The trial court seemed to base its CHINS adjudication entirely on the fact that Mother's home at the time of the fact-finding hearing had not yet been assessed to determine its appropriateness. That fact does not support a CHINS finding. Regardless of where Mother was living, it is undisputed that the children were living in a safe, appropriate home at the time of the fact-finding hearing. The fact that Mother struggled to find stable housing for herself, "even endured

---

hearing at all—thus, making this appeal untimely—we nevertheless elect to decide the merits of this appeal. *See In re D.J.*, 68 N.E.3d at 578-580 (holding the appeal of a CHINS determination is forfeited if brought before the court holds a dispositional hearing and enters a dispositional order; however, the reviewing court may elect to decide the merits of the forfeited appeal).

periods of homelessness, does not support the juvenile court's conclusion that the children were endangered, particularly when the children have never been without shelter" that was safe and adequate. *In re S.K.*, 57 N.E.3d at 883 (finding a CHINS determination clearly erroneous where the parents, like Mother in the instant case, "took deliberate actions to avoid placing the children in the endangering condition of homelessness"); *see also*, *In re S.M.*, 45 N.E.3d at 1256.

[28] Moreover, Mother testified that she had obtained her own safe and appropriate housing which DCS could visit and assess within the following week. Thus, there was no evidence that Mother was unwilling or unable to find appropriate housing so that her children could live with her in the near future. *See In the Matter of S.D.*, 2 N.E.3d at 1290 (holding the evidence insufficient to support a CHINS adjudication where, at the time of the fact-finding hearing, the parent had resolved all of the CHINS allegations except one final step—even though she was having difficulty completing that step—because there was no evidence that the parent was unwilling or unable to complete that step without the coercive intervention of the court). The trial court's finding that Mother failed to provide adequate housing for her children is not supported by the evidence.

[29] The CHINS petition filed in this case listed reasons for a CHINS finding in addition to housing concerns. Specifically, it alleged that: (1) Father was unable to care for the children due to his drug use; (2) Mother "struggles with untreated mental health issues;" (3) Al.W. had "been exhibiting behavioral and/or mental health issues the parents have been unable to adequately

address;" (4) Mother is a recovering drug addict but had been "clean for over a year;" and (5) the family had "a history" with DCS. Appellant's App. at 35. We address each of these in turn, under the general judgment standard of review. *In re S.D.*, 2 N.E.3d at 1287.

[30] While Father admitted to past and current drug use, the undisputed evidence showed that Father was not living with the children at the time the CHINS petition was filed or at the time of the fact-finding hearing. Nor was there any evidence that Father had ever used or sold drugs in the children's presence. And, the evidence indicated that Mother did not allow Father to visit with the children unsupervised, due to her own concerns about Father's drug use. Thus, there was no evidence that Father's drug use endangered the children at any point, and the evidence of Father's drug use did not support a CHINS determination. *Cf. M.C. v. Marion Cty. Dep't of Child Serv.* (*In re B.N.*), 969 N.E.2d 1021, 1026 (Ind. Ct. App. 2012) (holding child was not a CHINS due to witnessing domestic violence where mother had terminated her relationship with the abuser by the time of the fact-finding hearing).

[31] While Mother admitted to having her own mental health problems, there was no evidence at all that Mother's mental health ever affected the children in any way, much less endangered them to the point where court intervention was necessary. Moreover, Mother had obtained mental health services in the past, and was obtaining them at the time of the fact-finding hearing. Thus, even if DCS had provided any evidence that Mother's mental health adversely affected

the children—which it did not—Mother had remedied that issue by seeking treatment at the time of the fact-finding hearing.

[32] Nor do Al.W.'s mental health problems support a CHINS adjudication. DCS's November 25 preliminary investigation report showed that Mother had been obtaining mental health services for Al.W. before DCS became involved in this case. And the evidence presented at the fact-finding hearing indicated that Al.W. had continued to receive mental health treatment during the CHINS action and that Mother was willing to continue seeking that treatment for Al.W. in the future. The mere fact that those services had not yet cured Al.W's mental health problems is not sufficient to support a CHINS finding. *See, e.g.*, *A.H. v. Ind. Dep't of Child Serv.* (*In re A.H.*), 58 N.E.3d 951, 955 (Ind. Ct. App. 2016) (finding the child was not a CHINS where the mother sought treatment for the child and that treatment had been unsuccessful, but the mother was willing to continue seeking treatment for the child and there was no evidence the child's lack of recovery was attributable to some action or inaction of the mother). In addition, DCS presented no evidence to support its allegations that Mother did not have transportation to get Al.W. to his service providers.

[33] Mother's past drug use, which was the reason for DCS' previous involvement with her and the children, had been resolved before the current CHINS case was filed and remained resolved as of the time of the fact-finding hearing. Mother testified that she had not used drugs in over a year, and the drug screen she agreed to take "came back negative for all tested substances," leading FCM Stuckey to conclude that the CHINS allegations were unsubstantiated as to

Mother. Appellant's App. at 38; Tr. at 40-41. Furthermore, FCM Stuckey noted in her preliminary report that Mother was "committed to remaining substance free now and in the future for the safety and well-being of her children." Appellant's App. at 43. Therefore, neither Mother's past drug use nor DCS's past involvement with her due to her past drug use supported a finding that the children were CHINS.

# Conclusion

[34] The evidence did not support the trial court's finding that Mother had failed to provide adequate housing for her children. And there was no evidence to support the trial court's CHINS adjudication for any other reason contained in the CHINS petition.

[35] Reversed.

Baker, J., and Altice, J., concur.