



FILED

Apr 21 2025, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In the Matter of J.J. and Jer.J. (Minor Children), Children in Need of Services, and

M.J. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian ad Litem*

---

April 21, 2025

Court of Appeals Case No.
24A-JC-1676

Appeal from the Marion Superior Court

The Honorable Geoffrey Gaither, Judge
The Honorable Duane Merchant, Magistrate

Trial Court Cause Nos.
49D09-2212-JC-9232
49D09-2301-JC-262

**Opinion by Judge Kenworthy**
Judges Bradford and Pyle concur.

**Kenworthy, Judge.**

## Case Summary

[1]   M.J. ("Mother") appeals the trial court's adjudication of her two youngest sons as children in need of services ("CHINS"). Mother claims the trial court erred in finding the children to be CHINS because the Indiana Department of Child Services ("DCS") failed to present sufficient evidence that their physical or mental condition was seriously impaired or endangered or that court intervention was needed. We affirm.

## Facts and Procedural History

[2]   Mother has four sons, Jo., Jos., J.J., and Jer.J.[1] Jer.J. was born four weeks early on August 19, 2022, and was "small for [his] age." *Tr. Vol. 2* at 113. He

---

[1] J.R. is the father of Jo., born in 2014, and J.J., born in 2019. K.H. is the father of Jos., born in 2017. And R.N. is the father of Jer.J. All the fathers participated in the proceedings below but none of them participate in this appeal.

was discharged from the hospital a month later, but on October 7, he was admitted to Riley Hospital for Children for poor weight gain and viral pneumonia. While at the hospital, Jer.J. was evaluated by a speech therapist and found to have an "uncoordinated suck" leading to a risk of aspirating food into his airway. *Id.* at 112. Doctors placed a nasogastric tube ("NG tube") and trained Mother on using the NG tube for feeding Jer.J. Jer.J. was discharged on October 18 and Mother was instructed it was "very important for her to follow up with his pediatrician for weight checks" because "weight gain in the first two years of life . . . is tied to brain development and neurologic growths." *Id.* at 113–14. Before Jer.J. was discharged, Riley staff scheduled several appointments for him—including weekly appointments for weight checks—and communicated those appointments to Mother. Mother did not take Jer.J. to any of the appointments, and Riley made a report of medical neglect to DCS in late November.

[3] DCS assessment family case manager ("FCM") Ouassila Kaced was assigned to investigate the initial report. Mother told FCM Kaced she had been taking Jer.J. to a neighborhood clinic and that he was "doing just fine" and "thriving" despite the medical evidence and Kaced's own observations. *Id.* at 175. The clinic told DCS Mother had recently made a first appointment for Jer.J., but that appointment had not yet occurred. In other words, there was no evidence Jer.J. had received medical care or treatment since being discharged from the hospital in mid-October.

[4] DCS received a second report on December 7 alleging Mother hit J.J. and pulled his hair. FCM Kaced's efforts to contact Mother in person and by phone to investigate were unsuccessful.

[5] On December 11, Mother took Jer.J. to the Methodist Hospital emergency department for fever and vomiting. Doctors at Methodist wanted to transfer Jer.J. to Riley but Mother refused, saying she would take him to Riley "when she [could] fit it into her schedule." *Id.* at 130. Even after being informed doctors believed Jer.J.'s condition was life threatening, Mother still tried to leave with Jer.J. DCS and hospital security became involved, and Jer.J. was transferred to Riley and admitted.

[6] DCS filed a petition alleging Jer.J. was a CHINS because his physical or mental condition was seriously impaired or seriously endangered due to Mother's inability, refusal, or neglect to provide necessary medical care. DCS also requested and was granted an order removing Jer.J. from Mother's custody. Mother did not attend the initial/detention hearing. When Jer.J. was discharged from Riley, he was placed in foster care.

[7] After Jer.J.'s removal, FCM Kaced again attempted to contact Mother by various means to check on the other children but failed. FCM Kaced obtained an order compelling Mother to allow her to access the home and interview the children. FCM Kaced, accompanied by law enforcement, served the order on January 9, 2023. Initially, Mother would not let them in the house and used eight-year-old Jo. as a go-between to relay messages. Mother eventually

allowed access but tried to impede their movement throughout the house. The house had a bad odor and was very dirty; the refrigerator contained moldy food; the stove was not working; the toilet in the only bathroom was clogged; and there was only one bedroom and one bed with a dirty mattress for everyone and no crib or bassinette for Jer.J. FCM Kaced observed fruit flies and roaches in the home and an open container of bleach within reach of the children. Mother blamed the boys for making the mess.

[8] DCS did not immediately remove the children but soon after the home visit filed a petition alleging Jo., Jos., and J.J. were CHINS because their physical or mental conditions were seriously impaired or seriously endangered due to Mother's inability, refusal, or neglect to provide a safe, sanitary, and appropriate living environment. Mother appeared at the initial/detention hearing at which DCS requested and was granted an order removing the three boys from Mother's custody because of the "deplorable conditions of the home." *Id.* at 21.[2]

[9] No one was home when FCM Kaced went to Mother's home to execute the order of removal, but she managed to reach Mother by phone a few times over the next couple of days. Each time, Mother offered a different explanation about where J.J. was. Around 8 p.m. on January 14, 2023, several days after

---

[2] Jo. and Jos. were eventually placed with their fathers—J.R. and K.H., respectively. J.R. and K.H. were each granted custody of their sons during these proceedings. After the custody modifications, the CHINS cases for Jo. and Jos. were closed. Although this did not happen immediately and Jo. and Jos. were part of the CHINS case for a while, we will refer to only J.J. hereafter for clarity.

the initial hearing, Mother left J.J. outside the door of the DCS office. A DCS FCM drove J.J. to his father, J.R.'s home in Gary that night. J.J. remained in relative placement with J.R. throughout this case.

[10] The fact-finding hearing for J.J. and Jer.J.'s CHINS cases began on April 28, 2023, and continued over several dates until its conclusion on February 22, 2024. Mother attended the first two days of hearings but did not attend any hearings after May 5, 2023.

[11] Gwen Grant, the family's permanency FCM beginning in January 2023, put home-based casework and supervised visitation services in place for Mother. FCM Grant acknowledged Mother said she was using community resources before DCS involvement. She said if Mother is "doing all these services already[,] all she has to do is provide us with proof and let them become part of the [Child and Family Team]" so DCS could verify they were being done. *Id.* at 91. For Jer.J. to be returned to Mother's care, FCM Grant said Mother needed to be consistent with parenting time and "stay on track with his medical needs" by attending scheduled appointments. *Id.* FCM Grant testified court intervention was necessary to help Mother learn how to prioritize her time so "she can have more time . . . for her kids especially since she has a very sickly child." *Id.* at 44. FCM Grant felt Mother needed services to learn "some life balance"—"her children are of school-age[] and you can't work two jobs and be in school and run a household and get your kids ready for school and take them on . . . medical appointments if you're committed to those three areas: job, job, and school." *Id.* at 44–45.

[12] Mother's visitation with Jer.J. while the CHINS case was pending was inconsistent, but by July 2023, she showed signs of improvement "in terms of doing what is necessary to care for" Jer.J., and the bond between them had increased. *Tr. Vol. 3* at 6. At a visit on January 11, 2024, however, Mother told the visit supervisor she "was no longer comfortable with feeding [Jer.J.] through a [N]G-tube." *Id.* at 72.[3] The supervisor was caught off guard because Mother had been engaged in feeding Jer.J. previously. When asked to explain, Mother said, "[L]egal advised me that I should not be a part of the feeding and I shouldn't even be present when it's taking place." *Id.* at 72. Mother left the room while the visit supervisor fed Jer.J. The next three visits all ended early because of Mother's refusal to feed Jer.J. through the NG tube. The visit supervisor testified Mother is "very firm and adamant that she's not in agreement with" the NG tube feeding and her unwillingness to feed Jer.J. is a safety concern. *Id.* at 74.

[13] Mother's visitation with J.J. was also inconsistent. Demetria Williams was assigned as the visitation facilitator in May 2023, but was unable to successfully arrange a visit until July due to Mother's work schedule or failure to timely confirm appointments. Williams testified at the hearing in July 2023 that she had supervised four visits. Williams observed Mother was meeting J.J.'s basic

---

[3] By this time, Jer.J. was eating some solid food but "not consum[ing] a lot of it" so his nutrition was still being supplemented through the NG tube. *Id.* at 85. Mother also refused to give Jer.J. snacks the foster mother provided, because she felt "there's no way he should be doing both and so . . . she refuses to do either one[.]" *Id.* at 79.

emotional needs at visits but her priorities were torn between attending visits and getting overtime at work. Ryan Avery was also a visitation facilitator for J.J. He supervised virtual visits which "went pretty well" until shortly before the hearing on February 8, 2024. *Id.* at 100. By then, Mother had missed four visits in a row.

[14] As for the conditions of her home, Mother largely refused to allow anyone to access the home. Avery, who was also Mother's home-based caseworker, was in the home in March 2023. He described it as being "in pretty bad shape." *Id.* at 95. He was in the home again about a month later and "it was, you know, cleaner." *Id.* He had not been in the home since then—although he had tried to make appointments to meet Mother there for their casework, "something seems to always come up." *Id.* at 96. Mother made complaints to her landlord about the condition of her home but would not allow maintenance in to address the issues. She stopped paying rent in September 2023 and the landlord started eviction proceedings. Mother then made a complaint to the health department which paused the eviction, but she would not allow the health department in to inspect the home. The most recent permanency FCM, Claudia Smith, had not been allowed into Mother's home since she was assigned the case in September 2023.

[15] FCM Smith testified J.J. and Jer.J. "would not be safe under [Mother's] care" because she "has not demonstrated the ability to meet [Jer.J.'s] medical . . . needs or have a safe living environment for the children." *Id.* at 138. Mother's refusal to feed Jer.J. appropriately "is a big concern." *Id.* at 137. Mother could

alleviate those concerns by working with her providers and allowing a home study. But FCM Smith did not believe she would do that without court intervention because she had told Mother what was required "many times" and "she's had plenty of time to correct the unsafe . . . home, make it correct, meet with providers, she's just not wanting to." *Id.* at 138, 143.

[16] As noted above, Mother did not attend the last four days of the fact-finding hearing and did not testify. The only evidence Mother presented was the testimony of Deborah Alexander, a First Steps worker who provided services for J.J. until he aged out of the program in February 2022 and then remained in contact with Mother occasionally by phone. Alexander never met Jer.J. and had not been in Mother's home since early 2022. Alexander described Mother's home at that time as cluttered but not unsafe. She believed Mother could be a good parent but needed community support.

[17] In its fact-finding order, the trial court stated:

> It is in the best interest of [Jer.J.] and [J.J.] to be removed from the home environment. Remaining in the home would be contrary to the welfare of the children because of an inability, refusal, or neglect to provide adequate shelter, care and/or supervision and the children need protection that cannot be provided in the home. Coercive intervention of the court is required to ensure the family participates in needed services.

*Appellant's App. Vol. 2* at 38. The trial court later held a dispositional hearing—Mother did not attend—and entered its dispositional order.

## Standard of Review

[18] In a CHINS proceeding, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012); *see* Ind. Code §§ 31-34-1-1 to -11 (describing circumstances under which a child is a CHINS); I.C. § 31-34-12-3 (1997) (imposing preponderance standard). When we review a CHINS adjudication, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.J.*, 68 N.E.3d 574, 577–78 (Ind. 2017). Instead, "[w]e consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom." *K.D.*, 962 N.E.2d at 1253.

[19] The trial court here entered findings of fact and conclusions thereon *sua sponte* following the fact-finding hearing.[4] In such case, we review issues covered by the findings with a "two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). We review any issues not covered by the findings under the general judgment standard, meaning we will affirm the judgment if it can be sustained on any legal theory supported by the evidence. *Id.* We reverse a CHINS determination only if it is clearly erroneous. *D.J.*, 68 N.E.3d at 578. "A decision is clearly erroneous if the record facts do not support the findings or

---

[4] No statute expressly requires formal findings in a CHINS fact-finding order and none of the parties requested findings under Indiana Trial Rule 52(A). Mother challenges only the fact-finding order and does not challenge the dispositional order, which does require findings. *See* I.C. § 31-34-19-10(a) (2015).

if it applies the wrong legal standard to properly found facts." *Id.* (quotation omitted).

## The CHINS determination is supported by evidence and is not clearly erroneous.

[20] We would be remiss if we did not begin by commenting on the lengthy delay in bringing this CHINS case to disposition. The petition alleging Jer.J. was a CHINS was filed on December 12, 2022, and the petition alleging J.J. was a CHINS was filed on January 11, 2023. Indiana Code Section 31-34-11-1(a) requires a fact-finding hearing *to be completed* within sixty days of the filing of the petition. If all parties consent, that time can be extended by an additional sixty days. I.C. § 31-34-11-1(b). And our Supreme Court has held the fact-finding hearing may be extended beyond the 120 days provided by statute upon a finding of good cause. *In re M.S.*, 140 N.E.3d 279, 285 (Ind. 2020). No party has raised the issue of timeliness, so we will assume completion of the fact-finding hearing was appropriately continued beyond sixty days and there was good cause to extend it beyond 120 days.[5] After the good cause finding, however, everyone involved seemed to act as if there was no longer any urgency to conclude this matter. The fact-finding hearing was not concluded until February 22, 2024—a period of 407 days from the time the first petition was filed. In total, 585 days passed between the filing of the first CHINS

---

[5] Having said that, it appears the timelines were based on the later-filed petition rather than the earlier.

petition and the dispositional order.  The General Assembly has shown it considers CHINS actions a priority by placing time constraints on the proceedings and providing a mechanism for dismissal if the timelines are not met.  *See id.* at 283; *see also* I.C. § 31-34-11-1(d).[6]  The Supreme Court acknowledged as much in *M.S.*, and we therefore do not believe the Court intended to eliminate all time requirements when it allowed cases to proceed beyond 120 days.  We are troubled—to say the least—that bringing this case to resolution took nearly ten times the number of days allowed by statute, especially given that Mother's cooperation deteriorated as the case dragged on.  We hope and expect this case was an outlier and delays of this magnitude are unusual.

[21]  But, as noted, no party challenges the timeliness of the proceedings, so we proceed to consider the CHINS adjudication.  The purpose of a CHINS inquiry is to protect children, not punish parents.  *K.D.*, 962 N.E.2d at 1255.  Here, the trial court adjudicated the children as CHINS under the general neglect provision.  A child is a CHINS under this provision when:

> (1) [T]he child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability,

---

[6] A bill currently pending in the General Assembly would, among other things, provide that a procedural timeline in a CHINS case is not subject to waiver by a party to the proceeding except as permitted in specific circumstances and that the statutory deadline for holding a fact-finding hearing in a CHINS proceeding would not be subject to dismissal after 120 days if the court finds the extension is required because of unanticipated, emergent circumstances; the circumstances of the case; or the Indiana Rules of Trial Procedure.  The first provision would eliminate routine waiver of timelines in CHINS cases and the second appears to incorporate the Supreme Court's holding in *M.S.*  H.B. 1605, §§ 7 & 14, 124th Gen. Assemb. (2025).

refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision . . .; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. Our Supreme Court has interpreted this provision to require proof of "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *S.D.*, 2 N.E.3d at 1287.

Mother does not challenge any of the trial court's findings of fact, and we therefore take them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992). And Mother concedes Jer.J. was born with special medical needs and the conditions of her home at the time of J.J.'s removal were inadequate. *See Appellant's Br.* at 16. But she argues DCS did not prove the children's conditions are seriously impaired or endangered by her actions or inactions. She also argues DCS did not prove court intervention is necessary because she was providing treatment for Jer.J. and had voluntarily engaged in "a panoply of community and government services" to address the family's needs before DCS became involved. *Id.*

[23] Mother likens her case to *S.D.* and *In re A.H.*, 58 N.E.3d 951 (Ind. Ct. App. 2016), cases in which a CHINS determination was reversed. In *S.D.*, the Supreme Court found no evidence that mother was unlikely to provide appropriate care for her child with special medical needs without court intervention. Although mother had not completed the medical training necessary to care for the child at home, the evidence showed only that "she was still one small step away," not that she was unwilling or unable to complete the training. *S.D.*, 2 N.E.3d at 1290. And in *A.H.*, a panel of this Court found the coercive intervention of the court was not needed when evidence showed the parent did everything she could to seek help for her troubled child, but the care was "ultimately unsuccessful through no fault of the parent." 58 N.E.3d at 951. But in this case, Mother was not "one small step away" from caring for Jer.J.'s medical needs and had not done everything she could to show she could provide a suitable home.

[24] Here, DCS proved by a preponderance of the evidence the "three basic elements" supporting a CHINS adjudication. *S.D.*, 2 N.E.3d at 1287. The children's conditions were seriously impaired or endangered by Mother's actions or inactions and their needs were unmet. Jer.J. was removed from Mother's care because she was not appropriately addressing his precarious physical condition. She did not take him to follow-up medical appointments, and he was not gaining the expected amount of weight each week. And by the conclusion of the fact-finding hearing, Mother had expressed her disagreement with his medical treatment and refused to participate in feeding him, causing

continued concern for both his physical health and their emotional bond. As for the home, there was some evidence the conditions of Mother's home may have improved shortly after J.J. was removed. But Mother refused to allow anyone into her home for nearly a year after that assessment, so there was no way to know the home's current condition. And Mother's failure to cooperate in a home study necessary for reunification casts doubt on the home's safety for the children. Mother was also subject to an eviction proceeding.

[25] Moreover, the coercive intervention of the court was necessary to ensure the children's needs were met. When determining whether a child is a CHINS under Section 31-34-1-1, and particularly when determining whether the coercive intervention of the court is necessary, the court "should consider the family's condition not just when the case was filed, but also when it is heard." *Id*. at 1290. Based on the testimony provided over the course of the proceedings, Mother was uncooperative and inconsistent in the home-based casework and visitation services provided for her. She was unwilling to provide the medical care Jer.J. needed and obstructed DCS' efforts to verify the children would have safe housing if returned to Mother's care. Mother points to evidence she had community support in place before DCS involvement as proof the coercive intervention of the court was unnecessary. DCS acknowledged Mother said at the start she had sought out services on her own. But Mother did not testify and offered no evidence she continued to use—and more importantly, benefit from—those services during these proceedings. This argument is essentially a request to reweigh the evidence in Mother's favor and

disregard evidence of conditions at the time of the hearing, a request we must decline. *See K.D.*, 962 N.E.2d at 1253.

## Conclusion

The trial court determined the children are CHINS because Mother "needs assistance managing her living conditions and [Jer.J.'s] health condition and requires the coercive intervention of the court to ensure she gets the services she needs." *Appellant's App. Vol. 2* at 41. DCS presented ample evidence to support that determination, and the judgment is not clearly erroneous.

Affirmed.


Bradford, J., and Pyle, J., concur.


ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana


ATTORNEY FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E. Rokita
Indiana Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana