

**FILED**

Jul 28 2016, 8:16 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Attorneys for Mother (Je.K):
Eric M. Oliver
Fred L. Cline
Oliver & Cline, LLP
Danville, Indiana

Attorney for Father (Ja.K.):
Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: <br><br> S.K., R.K., M.K., and A.K., <br><br> Ja.K. (Father) and Je.K. (Mother), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | July 28, 2016 <br><br> Court of Appeals Case No. 32A01-1512-JC-2085 <br><br> Appeal from the Hendricks Superior Court <br><br> The Honorable Karen M. Love, Judge <br><br> Trial Court Cause No. 32D03-1506-JC-52 <br> 32D03-1506-JC-53 <br> 32D03-1506-JC-54 <br> 32D03-1506-JC-55 |

**Vaidik, Chief Judge.**

# Case Summary

Ja.K. (Father) and Je.K. (Mother) appeal the juvenile court's decision that their four children are children in need of services (CHINS). The sole issue for our review is whether the evidence supports the juvenile court's judgment that the children were CHINS pursuant to Indiana Code section 31-34-1-1. Concluding that the evidence does not show the children were endangered by the actions or inactions of Mother or Father, we reverse the CHINS adjudication.

# Facts and Procedural History

Mother and Father were married in 2002 and they had four daughters: A.K. (born January 6, 2003), R.K. (born December 8, 2004), M.K. (born December 5, 2005), and S.K. (born July 8, 2007). Mother and Father filed for dissolution of their marriage in Morgan County in May 2011. Father was awarded temporary custody of the children at that time. However, the dissolution action was dismissed for inactivity and a final custody determination was never made.

The children continued living with Father. For three years, they lived in Mooresville and attended Mooresville schools. Father and the children next lived with Father's aunt and uncle for nine months and attended Wayne Township schools. Then, at the beginning of 2015, Father's employment and housing became unstable. He and the children lived with a friend for a month, then they moved into a hotel with Father's father for about a month, and then Father's father lost his job and was unable to pay any portion of the living

expenses. Father did not have enough money to pay the hotel bill. He knew that he and the children were about to become homeless, so he took the children to live with Mother at the end of May 2015. During this period of instability, the children changed schools twice, attending schools in Monrovia and Plainfield. However, the children were in school at all times and maintained above-average grades.

[4] On June 10, the Indiana Department of Child Services (DCS) received a report that, among other things, Mother's boyfriend was using illegal drugs in the presence of the children. On June 15, Family Case Manager (FCM) Sarah Ash went to Mother's home to investigate. FCM Ash interviewed the four children and, according to her report, the three older children told her that they had never seen Mother or Mother's boyfriend take any kind of medicine or pills. The youngest child indicated that Mother's boyfriend "takes a lot of pills but they are for his back." Father's App. p. 15. FCM Ash said that she "didn't have any concerns during that initial visit in regards to the allegations in the report." Tr. p. 33-34. She took a fluid sample from Mother and Mother's boyfriend for drug screening, and she left the children with Mother for another four days. On June 19, Mother's drug screen came back positive for methamphetamine and amphetamine and she admitted taking two Adderall on the morning she gave the fluid sample. Based on the positive drug screen, FCM Ash removed the children, placed them with Mother's aunt (Aunt) and uncle (Uncle), and administered a second drug screen. On the second screen, Mother tested positive for amphetamine, but the level had dropped from 241.1 ng/mL

to 21.8 ng/mL. DCS continued screening Mother weekly, and all subsequent tests were negative.

[5] FCM Ash made her first contact with Father on the day of the detention hearing, June 22. Father told her that he was still looking for an apartment and that, at that time, the best place for the girls was with Aunt and Uncle. Ten days later, after the juvenile court placed the children in the care of DCS, Father moved into a home with his girlfriend, their five-month-old son, and her son from a previous relationship. According to FCM Ash, two weeks after moving into his new home, Father told her that he would take the girls if Mother could not.

[6] DCS filed a CHINS petition, and the juvenile court held the fact-finding hearing on August 12 and 26. At that hearing, Father testified that he wanted the girls and that it was in their best interests to live with him. However, he added that he needed financial help. He made $11.25 an hour working in a warehouse, and, over the four years that the girls lived almost exclusively with him, he received a total of $20 in child support.

[7] Uncle also testified at the fact-finding hearing. He described the girls' moods after visits and phone calls with their parents—"[t]hey just like go into a freeze[,]" refusing to talk to Aunt or Uncle and withdrawing. Tr. p. 64. Uncle also testified that the girls disliked Father's girlfriend and were upset when her name came up in conversation. Uncle had some difficulty understanding the children's behavior because he observed all of the visits and he did not hear

anything that he thought would lead to it. When Uncle discussed the children's behavior with Mother, she recommended that the girls see a counselor.

[8] The juvenile court issued an extensive list of findings, which we summarize. With respect to Father, the juvenile court found that "the girls have lived primarily with Father and only spent a few weeks with Mother[,]" Father's App. p. 51; Father's housing was unstable for several months in early 2015; Father said that the best place for the children was with Aunt and Uncle; Father currently lives with his girlfriend, whom the children dislike; Father is concerned about his ability to financially support the children. With respect to Mother, the court found that Mother's housing was unstable at the time of the fact-finding hearing and that Mother tested positive for methamphetamine once and amphetamine twice over a four-day period, and she admitted to using Adderall. And, with respect to the children, the juvenile court found that they changed schools multiple times; that they were upset for a day or two after Mother's visits; that one of the children was very upset the week before the fact-finding hearing and "was hateful to her sisters" during that week, *id.* at 49; and that the children do not get along well with Father's girlfriend.

[9] The juvenile court concluded[1] that the children's emotional condition was "seriously endangered as a result of the inability, refusal or neglect of their

_____

[1] The juvenile court labeled everything a finding of fact. However, we are not bound by the trial court's characterization of its results as "findings of fact" or "conclusions of law." *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002). Rather, we look past these labels to the substance of the judgment and will review a legal conclusion as such even if the judgment wrongly classifies it as a finding of fact. *Id.*

parents to provide shelter, education and supervision." *Id.* at 52. Specifically, the children experienced stress because of the "constant shuffling" between parents, Father's housing, Mother's drug abuse, and Father's recent decision that he doesn't want the girls to live with him. *Id.* "If the girls do not receive counseling, their emotional condition is seriously endangered." *Id.* And "[t]he parents are unlikely to provide or accept counseling for the girls without the Court's coercive intervention." *Id.*

[10] The juvenile court adjudicated all four children CHINS, and Mother and Father separately appeal.

# Discussion and Decision

[11] Mother and Father challenge the sufficiency of evidence supporting the trial court's order adjudicating the children as CHINS. At the outset, we note that Mother and Father have filed separate briefs. However, because a CHINS determination is based on the status of the children, we need not conduct a separate analysis concerning each parent. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Unlike termination proceedings, a CHINS adjudication need not establish culpability on the part of either or both parents. *Id.* at 105. Instead, a CHINS adjudication focuses on the condition of the children. *Id.*

[12] In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). Instead, we consider only the evidence

that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* at 1287. When the trial court enters findings and conclusions, we consider whether the evidence supports the factual findings and whether the findings support the judgment. *In re A.C.*, 905 N.E.2d 456, 461 (Ind. Ct. App. 2009). Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.*

[13] In this case, the CHINS petition was filed pursuant to Indiana Code section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication under Indiana Code section 31-34-1-1 "requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that

those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[14] Here the juvenile court concluded that, by failing to provide shelter, education, and supervision, Mother and Father seriously endangered the children's emotional condition. The court also concluded that the children needed counseling and that Mother and Father were unwilling to accept or provide the needed counseling for the children.

[15] The record and findings do not support a conclusion that the children lacked shelter, education, or supervision. Beginning with shelter, the record reflects that the children and Father had stable housing for nearly four years. It was not until early 2015 that Father went through a period of extreme housing instability, and he brought the children to Mother before he became homeless. Thus, there is no evidence that the children went without shelter. Moreover, Father found stable housing without State intervention and before the fact-finding hearing. The fact that both parents have struggled with housing, even endured periods of homelessness, does not support the juvenile court's conclusion that the children were endangered, particularly when the children have never been without shelter. *See In re S.M.*, 45 N.E.3d 1252, 1256 (Ind. Ct. App. 2015).

[16] There is, similarly, no evidence that the children have been deprived of an education, despite the fact that they have changed schools multiple times. There is no evidence that the children have missed school, or that there was a

time when they were not enrolled in school. On the contrary, the record reflects that the children have not only consistently attended school, but also maintained above-average grades.

[17] As to the lack of supervision, the juvenile court found that Mother and her boyfriend tested positive for methamphetamine and amphetamine on a day when they were the sole caregivers for the children. DCS argues that this is sufficient to establish endangerment according to the Indiana Supreme Court decision in *White v. State*, 547 N.E.2d 831 (Ind. 1989). There, a ten-year-old observed her parents' frequent use of intravenous drugs and marijuana, and the parents gave the ten-year-old marijuana to smoke on three occasions. However, this case is distinguishable from *White*. Mother tested positive for methamphetamine once and amphetamine twice, four days apart and at a substantially diminished level, and all of her subsequent weekly drug screens were negative. The children reported to FCM Ash that they had not seen Mother take any medicine or pills—so she did not expose them to her drug use. Most telling, FCM Ash left the children with Mother on the day when Mother tested positive, leading to the inference that Mother was not impaired at the time. This Court has previously held that the "finding of an isolated use of methamphetamine, without more, does not support the conclusion of law that [the child] was a CHINS." *In re L.P.*, 6 N.E.3d 1019, 1021 (Ind. Ct. App. 2014). And, in this case, the findings indicate nothing more than an isolated use.

[18]     Next, the juvenile court's findings do not support its conclusion that the children's emotional health is seriously endangered. None of the children's counselors testified about the nature or extent of any emotional or mental-health issues the children might have, leaving the juvenile court to rely upon the observations of the children's parents and caretakers. The record and findings reflect that the children do not get along with Father's girlfriend, they sometimes quarrel and say hateful things to each other, they are upset and withdraw after visits with their Mother, and they are anxious about having to move or change schools. These facts are not sufficient to support the conclusion that the children are *seriously* endangered.

[19]     The juvenile court also concluded that the children needed counseling and that the parents would not provide or accept the counseling without the coercive intervention of the court. The only evidence in the record with respect to Mother's or Father's willingness to accept counseling for the children is Uncle's testimony that Mother recommended the children receive counseling when he discussed their behavior with her. The conclusion that coercive intervention is required to obtain counseling for the children is, therefore, unsupported.

[20]     To be a CHINS, a child must be seriously impaired or endangered "*as a result of the inability, refusal, or neglect of the child's parent*" to provide necessary care. Ind. Code § 31-34-1-1 (emphasis added). Children cannot become CHINS by the mere happenstance of a family's economic misfortune; the statute requires an action or failure to act by the parent that leads to serious endangerment of the children as a result of the lack of necessary care. *In re S.M.*, 45 N.E.3d at

1256 ("The mere fact of an unemployed parent does not make a CHINS. The mere fact of a family on food stamps does not make a CHINS. Even the mere fact of a family living in a shelter while seeking stable housing does not make a CHINS."). In this case, the children were not endangered by the acts or omissions of the parents. In fact, the parents took deliberate actions to *avoid* placing the children in the endangering condition of homelessness. We therefore conclude that the juvenile court's determination that the children are CHINS was clearly erroneous.

Reversed.

Barnes, J., and Mathias, J., concur.