## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 05 2017, 6:30 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William W. Gooden
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

M.J., Minor Child,

and

K.M., Mother,

*Appellant-Respondent*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

May 5, 2017

Court of Appeals Case No. 65A01-1612-JC-2786

Appeal from the Posey Circuit Court

The Honorable James M. Redwine, Judge

Trial Court Cause No. 65C01-1606-JC-110

**Brown, Judge.**

[1] K.M. ("Mother") appeals the trial court's order determining that M.J. is a child in need of services ("CHINS"). Mother raises one issue which we revise and restate as whether the evidence is sufficient to support the court's determination that M.J. is a CHINS. We affirm.

## Facts and Procedural History

[2] M.J. was born in March 2004. The Indiana Department of Child Services ("DCS") received a report of abuse or neglect regarding M.J. and conducted an assessment in June 2016. Mother submitted to a drug screen which returned positive for methamphetamine. On June 22, 2016, DCS filed a petition alleging M.J. was a CHINS.[1] The petition alleged Mother tested positive for methamphetamine on or about June 16, 2016; Mother admitted to the use of methamphetamine and use of hydrocodone in an attempt to self-medicate due to struggles with prescription medication; Mother reported her struggle to obtain services has resulted in the use of methamphetamine as a coping mechanism; and the exposure of M.J. to involvement with illegal and impairing substances indicates an ongoing lack of appropriate supervision which has not been remedied.

[3] On October 5, 2016, the court held a fact-finding hearing at which it heard testimony from Mother and the DCS family case manager assigned to M.J., Lindsey Huffer ("FCM Huffer"). Mother testified that M.J. was twelve years

---

[1] DCS's pre-dispositional report states that the date of removal of M.J. was June 20, 2016, and that M.J. was placed in relative foster care.

old, FCM Huffer and another person made contact with Mother in June 2016 and asked her to submit to a drug screen, and she submitted to the screen the following day. Mother indicated that they asked about her drug use and she told them she had recently used methamphetamine. She also stated she was using prescription medication, Lortab, for which she did not have a prescription at that time and that Lortab is opiate. When asked how long she had been using opiates at that point without a prescription, Mother said "I don't know exact amount. A year or two." Transcript Volume 2 at 8. When asked why she did not attempt to obtain a prescription for the medication, she replied "I don't, I can't answer that, honestly," and when asked how she obtained the medications, she answered "[o]ff of the streets." *Id.*

[4] Mother indicated she is obtaining substance abuse treatment through Raintree Counseling, that she obtained "help with the pain pills through [her] pain management doctor," and that she has tested negative on "all of their drug tests." *Id.* at 9. She stated she had been seeing a doctor at Southwestern Indiana Mental Health since she was fifteen years old, she has anxiety and depression, she had been receiving counseling every three months for her anxiety and depression earlier in the year, and that she was now off medicines. When asked about her methamphetamine use, Mother answered "I messed up and used that one weekend. [M.J.] was gone and I was trying to numb myself from everything going around me." *Id.* at 11. She said she smoked methamphetamine "[t]hat one time and got caught." *Id.* When asked if she had ever previously used methamphetamine, Mother responded "[w]ay in the

past, Um, years" and "I did it in 2011. I did it one other time, maybe 2009." *Id.* When asked if she felt like she still needed to go to counseling, she answered in the negative, and when asked if she believed the drug screens helped hold her accountable, she testified "[n]o. It's this whole lesson learned" and "I did it one time and got caught. And now my daughter is paying for it." *Id.* at 12.

[5] On cross-examination, Mother indicated that M.J. was not present when she used methamphetamine in June, 2016 and had been gone with a friend for that weekend. *Id.* at 13. Mother further testified that she had been prescribed Lortab "a year or two prior to being on them, with a prescription." *Id.* at 14. She stated the last time she had used Lortab without a prescription was when she started pain management "[a]bout a month and a half ago." *Id.* She indicated she never used Lortab in the presence of her child and that her child never knew. Mother also testified that she is now thirty-three years old, she is no longer in counseling with a doctor due to DCS, and she recently attempted to see the doctor but was told she could not obtain their counseling while obtaining help with opiates and that DCS had contacted that office.

[6] Mother stated that M.J. is twelve years old, during her lifetime has never gone without food, clothing, shelter, or medical care, has attended school, and has never been unsupervised when she should have been supervised. Mother indicated she did not know of any care, treatment, or rehabilitation that M.J. needs that she was not providing, and that M.J. started talking to a counselor at school since she was taken out of the home and it is fair to say that DCS's

involvement has created a problem for M.J. She further indicated the DCS workers inspected her home and did not indicate it was unsafe for M.J., that something needed to be corrected, or that there was some care M.J. needed but was not receiving. On redirect examination, when asked if she felt like she needed any kind of counseling for her substance abuse issues, Mother replied "I don't feel like I need them but I'm getting them." *Id.* at 21.

[7] FCM Huffer testified that she walked through M.J.'s home, the home was not dirty, and there were appropriate beds in the home. She testified that on June 20, 2016, she discussed with Mother that she had testified positive for methamphetamine and needed to discuss the removal of M.J. According to FCM Huffer, Mother indicated to her that June 6th was her last use of methamphetamine, Mother gave her prescription bottles to FCM Huffer and stated that her doctor had taken her off "cold turkey, but she couldn't stop the usage," and Mother stated that she attempted to obtain help and needs help with the opiates but not the methamphetamine. *Id.* at 27.

[8] FCM Huffer also testified that on June 27th, 2016 Mother "wanted to talk to me about the paperwork that was filed that stated that the methamphetamine was not a coping strategy it was recreational usage." *Id.* FCM Huffer further indicated that, after the CHINS case was filed, DCS offered Mother a drug assessment, that Mother asked to begin the drug assessment on August 2nd, and Mother officially started with the drug screens on August 23rd. With respect to the assessment, FCM Huffer testified "the first time she went she did end up walking out so the counselor told me that she couldn't give me any

information as far as what she's recommending," "we had her come in like a week later I believe, and she finished out the assessment," and "they were recommending outpatient intensive services" in a sixteen-week program. *Id.* at 29. FCM Huffer stated that Mother believed the outpatient program was too intense for her, she was given a couple of different options, and she decided on Raintree Counseling. She testified Mother had attended Raintree once and that she had not received any recommendations from Raintree as of that day. When asked if, since Mother had been screening, "has she been positive," FCM Huffer answered "No. Well, besides the medication she's currently prescribed." *Id.* at 31.

[9] On cross-examination, Mother's counsel asked if Mother had admitted to any other methamphetamine use other than in June 2016 and "other than maybe five (5) or six (6) years ago," and FCM Huffer replied "[n]o." *Id.* at 35. When asked "what treatment does she need that she is not getting," FCM Huffer answered "[t]he counseling," and when asked "[w]hat does that have to do with [Mother] having tested positive for meth on one (1) occasion? Anything?" she replied "[n]ot that I'm aware of." *Id.* at 37-38. When asked "How about having used Loritab [sic] without a prescription? Is that anxiety connected to that?" she answered "[n]ot that I'm aware of." *Id.* at 38.

[10] FCM Huffer testified she was recommending that the family participate in services to maintain Mother's stability, that Mother has not yet completed her substance abuse treatment and has been doing drug screens for about a month and a half, and DCS has not yet received a recommendation from Raintree.

[11]     The trial court found:

> Mother admitted to one (1) time use of methamphetamine. She also admitted to using methamphetamine in the past, in 2011 and 2009. But more importantly to the Court, she admitted to contemporary use of Loritabs [sic] when she had no prescription for Loritabs [sic] and indicating she was getting those drugs off of the streets. Meaning that every time that she bought a Loritab she was committing a felony. So, this is not a case of a single use by the Mother. . . . Mother is using Loritabs [sic] on a regular basis. The Court finds that it is proven by a preponderance of the evidence that the Mother's ability to provide care and custody of the child is impaired or likely to be impaired by her ongoing use of prescription medications without a prescription. And that is one of the allegations in the Petition. It says child's Mother admitted to use of amphetamine and use of hydrocodone in an attempt to self medicate, due to struggle with prescription medication. So, [DCS] has proved by a preponderance of the evidence that the child is a child in need of services.

Transcript Volume 2 at 47-48. The court states in its chronological case summary entry for the fact-finding hearing that it finds DCS acted reasonably in becoming involved in the lives of the family and it would have been unreasonable and contrary to the health, safety, and welfare of the child for it to not have intervened.

## *Discussion*

[12]     The issue is whether sufficient evidence supports the trial court's determination that M.J. is a CHINS. In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.*

Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[13]   Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *In re A.H.,* 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the child. *Id.*

[14] Mother contends there is no evidence "that Mother's drug usage, minimal as it was, caused M.J. to lack food, clothing, shelter, medical care, education, or supervision." Appellant's Brief at 6. She argues that DCS's case was based solely on her drug usage and that "[t]he evidence supporting this consists in its entirety on a positive test for methamphetamine on June 16, 2016, Mother's admission that she had used opiates for which she had no prescription 'about a month and a half ago,' and her admission that prior to the June 16 positive methamphetamine screen she had last used that drug in 2011." *Id.* at 7 (citing Transcript Volume 2 at 14). She also argues that DCS acknowledged it had no evidence that she ever used methamphetamine or opiates when she was caring for M.J. and that there was no evidence she was impaired while M.J. was in her care.

[15] DCS maintains that the evidence shows Mother had a pervasive substance abuse problem with illegally acquired opiate pain medication for a year or two while caring for M.J., and that there is no question that, during the entire time Mother was and is using opiates, she had responsibility for M.J.'s care and custody. In reply, Mother contends that nothing in the record indicates she had custody of M.J. during the one- or two-year period she was using non-prescribed drugs. Mother argues that DCS did not address her argument that there was no evidence that M.J. was deprived of necessary food, clothing, shelter, medical care, education, or supervision and that perhaps the failure of the DCS to address the issue is a concession that such evidence was in fact lacking.

[16]     The record reveals that Mother tested positive for methamphetamine on or about June 16, 2016, and she indicated that she previously used methamphetamine in 2009 and 2011. Mother indicated that M.J. was living with her when DCS visited her in June 2016 and that at the time she was using prescription medication, Lortab, which was an opiate, for which she did not have a prescription. She testified that she had been using opiates without a prescription for "[a] year or two" and that she obtained the medication "[o]ff of the streets." Transcript Volume 2 at 8. Mother had previously had a prescription but could not stop her usage after she no longer had a prescription. Although she indicated M.J. was not present when she used the methamphetamine or Lortab, when asked if she believed her use of opiate medication without a prescription was an issue, Mother answered affirmatively, that she had been trying to obtain help, and that she is now obtaining help for that. When later asked if she felt like she needed any kind of counseling for her substance abuse issues, Mother answered "I don't feel like I need them but I'm getting them." *Id.* at 21. FCM Huffer testified that, on June 20, 2016, Mother had indicated to her that she needs help with the opiates but not the methamphetamine, and that a parent's drug use would affect the parent's ability to supervise her child. We also note Mother ended up walking out of her first substance abuse assessment and, after she later completed the assessment, believed the recommended sixteen-week outpatient program was too intense for her.

[17] To the extent Mother characterizes her drug use as minimal, we note the trial court expressly found that "this is not a case of a single use by the Mother," she is using illegally-obtained prescription medication "on a regular basis," and Mother's ability to provide care is impaired or likely to be impaired by her ongoing use of prescription medications without a prescription. Transcript Volume 2 at 47. The evidence presented at the fact-finding hearing supports the court's determination. The evidence does not establish a mere single or isolated instance of proscribed drug use but rather reveals Mother's use of and struggle with prescription medication over a meaningful period of time, which she was unable to or did not satisfactorily address prior to DCS's involvement.[2] As noted, the CHINS statute does not require that a court wait until a tragedy occurs to intervene. *See In re A.H.*, 913 N.E.2d at 306. Based upon the record, we conclude that the judgment reached by the trial court is not clearly erroneous.

---

[2] In support of her argument, Mother cites *In re S.M.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015), and *In re S.K.*, 57 N.E.3d 878 (Ind. Ct. App. 2016). In finding that the evidence did not support the CHINS determinations, the court in those cases, observed that the evidence showed either a prior history of sporadic substance abuse or an isolated instance of drug use without more. *See In re S.M.*, 45 N.E.3d at 1256 (noting that the mother had a history of sporadic marijuana use but stopped using marijuana as soon as she realized she was pregnant and that the substance abuse assessment did not recommend substance abuse treatment); *In re S.K.*, 57 N.E.3d at 883 (observing that the court's findings indicate nothing more than an isolated use). Here, the trial court found and the evidence supports the conclusion that Mother had used prescription medication without a prescription which she obtained off the streets for one or two years prior to DCS's involvement. Her use of prescription drugs without a prescription was not sporadic, not an isolated instance, and had not ended prior to DCS's assessment. We find *In re S.M.* and *In re S.K.* to be distinguishable.

## *Conclusion*

[18]     For the foregoing reasons, we affirm the trial court's determination that M.J. is a CHINS.

[19]     Affirmed.

May, J., and Pyle, J., concur.