## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 31 2017, 10:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT C.E.

Daniel G. Foote
Indianapolis, Indiana

ATTORNEY FOR APPELLANT A.G.

Megan Shipley
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.E., L.E., P.E., and A.G. (Minor Children),

Children in Need of Services,

and

C.E. (Father) and A.G. (Mother),

*Appellants-Respondents,*

v.

October 31, 2017

Court of Appeals Case No. 49A02-1705-JC-1026

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Beth L. Jansen, Magistrate

| Indiana Department of Child Services, | Trial Court Cause Nos. 49D09-1610-JC-4004, -4005, -4006, -4007 |
|---|---|
| *Appellee-Petitioner* | |

**Crone, Judge.**

# Case Summary

[1] C.E. ("Father") and A.G. ("Mother") appeal a trial court order adjudicating their sons, J.E., L.E., P.E., and A.G. (collectively "the Children"), as children in need of services ("CHINS"). They have filed separate appellant's briefs and raise several issues, all of which amount to a challenge to the sufficiency of the evidence to support the trial court's CHINS determination. We affirm.

# Facts and Procedural History

[2] The facts most favorable to the CHINS adjudication are as follows. Mother and Father are the parents of A.G., J.E., P.E., and L.E., ages six, five, four, and two, respectively, at the time of the CHINS factfinding hearing. In October 2016, the Department of Child Services ("DCS") acted on a report that a couple years before, Father had molested an eleven-year-old extended relative on three or four occasions while babysitting her. Police investigated the allegations, but DCS was not aware of any criminal charges. That same month, DCS received reports that A.G. had been inappropriately touched by another child and by Father.

[3] As part of DCS's initial assessment, family case manager ("FCM") Mary Thilman interviewed Mother, who reported that she did not have any concerns about Father but at the same time revealed that she had found a cellphone photo showing A.G. (then age three) with his mouth around then two-year-old J.E.'s penis. Father later testified that he believed that either A.G. or J.E. had taken the photo. Tr. Vol. 2 at 62, 64. Mother told FCM Thilman that she took A.G. for therapy after the photo incident but that she discontinued the therapy because Father did not believe that A.G. needed therapy and because she disagreed with the therapist's recommendation that A.G. be medicated.

[4] On October 25, 2016, DCS filed a petition seeking to have the Children adjudicated as CHINS. The petition alleged that Mother and Father had failed to provide the Children with a safe, stable, and appropriate living environment free from sexual abuse, citing both A.G.'s and the extended relative child's allegations against Father, Father's continued unsupervised access to his Children despite an active protective order forbidding such contact,[1] A.G.'s maladaptive sexual behaviors, Mother's failure to ensure that A.G. received necessary services, and Mother's failure to take action to protect the Children from further victimization. In lieu of removing the Children from Mother's care, DCS put service providers in place to ensure their safety. At the detention hearing, the trial court ordered that for Mother to keep the Children in her care,

---

[1] The record shows that Mother had procured protective orders forbidding contact between Father and the Children (and Mother).

she must cooperate in homebased therapy, ensure that Father vacated their Indianapolis residence, and allow no contact between the Children and Father. Mother admitted to FCM Alicia Klingerman that she used marijuana to alleviate her stress. She also used oxycodone, which she asserts that she had taken for tooth pain but for which DCS could not verify a valid prescription.

[5] At the end of 2016, Father spent a few weeks in Michigan, and the Children resided with Mother, first at their Indianapolis home and then in Anderson with Mother's mother ("Grandmother"). A.G. and Mother underwent therapy while living in Indianapolis, but DCS could not verify Mother's assertion that they continued their therapy while living in Anderson. Mother tested positive for THC on January 11, 2017.[2] Two weeks later, DCS removed the Children from Mother's care when it was discovered that Grandmother had given the Children Seroquel as a sleep aid without a prescription.[3] Mother admitted to Madison County FCM Chandler Dickerson that she knew that Grandmother had given the Children Seroquel a few times. The Children were placed in foster care, and Mother was ordered to continue services and submit to random drug screens.

[6] Mother resigned from her job in Anderson and moved back to Indianapolis, where she began residing with her friend in a makeshift bedroom in the

---

[2] THC is the active ingredient in marijuana.

[3] Seroquel is a medication used to treat bipolar disorder and schizophrenia. It is available by prescription only and is prescribed for patients over age ten.

unfinished basement of a three-bedroom house. To prepare for reunification, Mother put two beds and one portable crib in the basement room for the Children. In total, including Mother and the Children, eleven people would be residing at the house. Mother was unemployed but was applying for jobs. Meanwhile, after returning from Michigan, Father helped his friend install doors and windows, for which he was paid on the "side." *Id*. at 56-57. He moved in with a friend who owned a home with enough room for the Children. Father was permitted supervised visitation but, as of the February 6, 2017 factfinding hearing, he had not seen the Children since Thanksgiving 2016.

[7] At the factfinding hearing, Mother admitted that she had allowed Father to spend time with the Children during times when there were protective orders in place. She said that she was not concerned about Father spending time with the Children because she was "in control" of his time with them. *Id*. at 16-17. When asked specifically about A.G.'s and the extended relative's sexual abuse allegations against Father, she replied, "As long as I have control over how he sees or when he sees the[] [Children] and it is supervised, then yes, he can see them." *Id*. at 20. FCM Klingerman expressed concern over Mother's unstable housing, inappropriate sleeping arrangements for the Children, and drug use. She testified that she had no concerns about Mother's ability to supervise the Children so long as Mother was not under the influence of illegal substances. *Id*. at 32-33. She expressed concern about Father's lack of steady employment, the sexual abuse allegations against him, and his failure to engage in services, although she noted that Father had expressed dissatisfaction with DCS for not

setting up services. She also emphasized A.G.'s continuing need for therapy for his maladaptive sexual behavior. Guardian ad litem ("GAL") Alexa Peterson expressed concern about the Children sharing beds at Mother's home due to A.G.'s maladaptive sexual behavior involving his younger brother J.E. She requested DCS's assistance in securing individual beds for the boys and noted that if adequate sleeping arrangements were not secured, it would be a "deal breaker" for her recommendation to transition the Children back to Mother's care. *Id*. at 71-72.

[8] At the close of the factfinding hearing, the trial court ordered Mother and Father to submit to drug screens and took the CHINS matter under advisement. On March 1, 2017, Mother filed a motion for placement. After a hearing and over DCS's objections, the trial court placed the Children with her under a temporary trial home visit. On March 24, 2017, the trial court issued an order with findings of fact and conclusions thereon, adjudicating the Children as CHINS.[4]

[9] Both Mother and Father appeal the CHINS determination. Additional facts will be provided as necessary.

---

[4] The court subsequently held a hearing to address placement and visitation issues, continuing the Children's temporary trial home visit with Mother and noting that although Mother's homebased services and Father's therapy were going well, Father had not visited the Children due to a positive drug screen. To the extent that Mother and Father cite such progress after the CHINS factfinding and adjudication and the successful closure of the CHINS in the summer of 2017, this information cannot be considered in examining the sufficiency of the evidence to support the CHINS determination.

# Discussion and Decision

[10] Mother's and Father's arguments are essentially challenges to the sufficiency of the evidence to support the CHINS determination. When reviewing the sufficiency of evidence, we give due regard to the trial court's ability to assess the credibility of witnesses. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the trial court's decision. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Where the trial court issues findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.P.*, 949 N.E.2d 395, 400 (Ind. Ct. App. 2011). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id*. "Findings are clearly erroneous only when the record contains no evidence to support them either directly or by inference." *K.B. v. Ind. Dep't of Child Servs.*, 24 N.E.3d 997, 1001-02 (Ind. Ct. App. 2015) (citation omitted). "A judgment is clearly erroneous if it relies on an incorrect legal standard." *Id*. at 1002.

[11] In a CHINS proceeding, DCS bears the burden of proving by a preponderance of the evidence that a child meets the statutory definition of a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

[12] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s). *N.E.*, 919 N.E.2d at 105. In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services." *Id*. (citations omitted).

[13] Mother and Father maintain that the trial court erred in concluding that the Children have been seriously impaired or endangered due to any inability, refusal, or neglect on their part to provide them with necessities or adequate supervision absent the court's coercive intervention. Mother specifically asserts that her drug use was isolated and that her unstable housing, failure to engage in services, and supervisory failures had been remedied as of the time of the factfinding hearing. Father claims that the sexual abuse allegations against him

are unsubstantiated and amount to speculation. He also maintains that DCS failed to provide him services despite his requests. We address their claims below.

[14] As part of its order following the CHINS factfinding hearing, the trial court issued extensive findings of fact. Mother specifically challenges portions of findings 11, 16, 21, 23, and 32.[5] Finding 11 reads, in pertinent part, "Mother is not employed and plans to rely on a tax check and government assistance." Mother's App. Vol. 2 at 145. Mother admits that the finding is true but maintains that it is incomplete and misleading because she was applying for jobs at the time. There is evidence in the record, including Mother's testimony, that supports the finding as true of the circumstances at the time of the factfinding. Thus, finding 11 is not clearly erroneous. *See In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014) (CHINS finding considers family's condition at time of factfinding hearing).

[15] Finding 16 addresses FCM Thilman's observation during her investigation that "Mother was not able to control her children." Mother's App. Vol. 2 at 145. Mother's claim of error zeroes in on the day that Thilman came to her home to interview her, and she correctly observes that Thilman never testified that the Children were out of control during that interview. However, finding 16 also states, "Mother acknowledged to FCM Thilman that there was a picture of

---

[5] Father generally "contends that Findings of Fact 6-43" are unsupported/insufficient. Father's Br. at 21. However, he does not direct his arguments specifically to any numbered findings.

[A.G.] with his mouth around [J.E.'s] penis." *Id*. The record includes evidence of a conversation between Mother and Father concerning the photograph being taken while the Children were in her care (and possibly while she was asleep). FCM Thilman's testimony was not limited in scope to cover only what she saw during the assessment interview. As such, we believe that the finding should be interpreted to include Thilman's overall observations and conclusions based on the entirety of her investigation. Finding 16 is not clearly erroneous.

[16] Finding 21 states in pertinent part, "Mother acknowledged drug abuse in the form of THC and Oxycodone." *Id*. Mother disputes that she ever *abused* oxycodone, citing her explanation that the reason that she did not produce proof of a valid prescription was that she had discarded that bottle and was unaware that she could go to the dispensing pharmacy to obtain a copy of her prescription for DCS. This argument goes to the weight of the evidence, and we remind her that we may not reweigh evidence or reassess witness credibility. Finding 21 is not clearly erroneous.

[17] Mother also challenges the portion of finding 23 that reads, "[Father] is not participating in the services currently being offered to him." *Id*. Father does not specifically challenge this finding, admitting that he did not participate in services, but he complains that he was willing to participate in services and that DCS was derelict in not providing him any services. In this vein, we note that even in CHINS cases that result in termination of parental rights, DCS is not obligated to provide or offer services to the parent. *S.E.S. v. Grant Cty. Dep't of Welfare*, 594 N.E.2d 447, 448 (Ind. 1992). Here, Father's complaint concerns a

timeframe in which a CHINS finding had not yet been made. Even so, we note that he left for Michigan for several weeks immediately after the CHINS petition was filed and thus would have been unavailable for any such services during that time. Finding 23 is not clearly erroneous.

[18] Mother's challenge to finding 32 involves the trial court's statement of its concern about Mother's inability to keep the Children safe. In its entirety, finding 32 reads, "The biggest concerns are the statements the children have made, Mother's inability to keep the children safe from Father and the living situation." Mother's App. Vol. 2 at 146. We believe that this finding is essentially an overall summary or conclusion regarding the trial court's bases for its CHINS determination. Even so, evidence in the record supports this finding. Mother testified at the factfinding that she had no concerns about the sexual abuse allegations against Father, emphasizing that she would be in control of his visitation and ensure that she was there to supervise. Yet, at the outset of the CHINS proceedings, she allowed Father to spend time with the Children despite an active protective order prohibiting such contact. In all, she procured three protective orders against Father, yet in defending her actions, she claims that she was unaware that the Children were named as protected persons in any of those orders. The third order, still in effect at the time of the factfinding hearing, listed only Mother as a protected person, and Mother expressed a desire to have that order dismissed. Finding 32 is not clearly erroneous.

[19]     The trial court's CHINS order includes nearly forty unchallenged findings. These include specific findings that A.G. and J.E. had been sexually active with each other, as evidenced by a photograph, that both Mother and Father were aware of the photo and/or had seen it, and that Mother had arranged to continue having A.G. and J.E. sleep together in the same bed despite admitting that it is inappropriate for them to share even a bedroom. The court also found that A.G. and another child had made allegations against Father for sexual abuse and that although Mother had initially enrolled A.G. in therapy due to the photo and allegations, she discontinued A.G.'s therapy because Father did not deem it necessary and the therapist wanted to medicate A.G. Additionally, the court found that Mother plans to allow contact between Father and the Children notwithstanding the sexual abuse allegations and that she expressed no safety concerns regarding Father's supervised visits. The court also found that Mother had allowed contact between Father and the Children in violation of a protective order. The court specifically found Mother's housing to be unstable, having moved from her Indianapolis home to Anderson, where she was aware that Grandmother had been giving the Children Seroquel, and most recently having moved back to Indianapolis to a makeshift bedroom in the unfinished basement of a three-bedroom house with eleven total occupants and inappropriate sleeping arrangements. The court also found Mother's drug history to be concerning, noting that she had used THC during the CHINS case, could not produce proof of a valid prescription for oxycodone, and denies having any substance abuse issues. Finally, the court specifically found that Father never admitted to any sexual wrongdoing and that he was evasive and

incredible. Mother's App. Vol. 2 at 144-146; Father's App. Vol. 2 at 144-46. These unchallenged findings are sufficient to support the trial court's determination that the Children meet the statutory definition of CHINS.

[20] Notwithstanding, we address a few specific arguments raised by Mother and/or Father. Mother maintains that the trial court improperly relied on her previous, allegedly isolated drug use and relies on cases in which other panels of this Court found similar evidence insufficient to support a CHINS determination. *See In re S.K.*, 57 N.E.3d 878, 883 (Ind. Ct. App. 2016) (mother and boyfriend's positive test for amphetamine and methamphetamine on day when they were children's sole caregivers not of itself sufficient to establish serious endangerment); *see also In re S.M.*, 45 N.E.3d 1252, 1256-57 (Ind. Ct. App. 2015) (where child's meconium tested positive for marijuana at birth and where all mother's drug screens during CHINS pendency were clean, court held that a *history* – whether of substance abuse, DCS contacts, or crimes – is not itself sufficient to establish serious endangerment). The *S.K.* and *S.M.* courts emphasized that a finding of serious endangerment cannot be based *solely* on *previous* drug use, whether isolated or habitual. In contrast, here, Mother failed at least one drug screen during the pendency of the CHINS proceedings, having tested positive for THC less than four weeks before the factfinding hearing. She admitted to FCM Klingerman that she used marijuana when she was stressed and indicated that the CHINS proceedings caused her stress. We cannot categorically designate Mother's drug use as "previous." Nor may we designate it as the "sole" basis for the trial court's decision. Throughout the unchallenged

findings, the trial court emphasized its concern about other matters such as the sexual behaviors between the Children, the sexual abuse allegations against Father, Mother's failure to take steps to protect the Children (having ignored protective orders that she herself had requested), and her inappropriate housing and sleeping arrangements for the Children. In short, Mother's reliance on *S.K.* and *S.M.* is misplaced.

[21] As for Mother's claim that she had corrected her issues before the factfinding hearing and thus did not need the coercive action of the trial court, we agree that she made a good decision to move out of Grandmother's house when the Children were removed, even though it forced her to resign from her Anderson job. She admitted that she knew that Grandmother had, on a few occasions, given the Children a prescription drug used to treat bipolar disorder and schizophrenia and that she moved out so that she could get her Children back. However, housing remained an issue up to the date of the factfinding hearing because, under the unique circumstances of the case, where two of the boys had engaged in sex acts with each other, it was inappropriate (per the GAL's testimony and Mother's own admission) to have them sleeping in the same bedroom, let alone in the same bed.

[22] Finally, Father complains that A.G.'s and the extended relative's sexual abuse allegations against him were speculative and thus could not be considered as a basis for the CHINS determination. He predicates his claim on his persistent denial of the abuse allegations and the fact that police conducted a criminal investigation and did not pursue criminal charges against him. We remind him

of the heightened standard of proof in criminal proceedings. In contrast, here, DCS was obligated to prove only by a preponderance of evidence that the Children have been seriously endangered or impaired due to any inability, refusal, or neglect on his and Mother's part to provide them with necessities or adequate supervision absent the court's coercive intervention. *N.E.*, 919 N.E.2d at 105; Ind. Code § 31-34-1-1. The trial court specifically found Father to be evasive and without credibility. The evidence most favorable to the CHINS determination shows that an eleven-year-old relative alleged that Father molested her on at least three occasions while babysitting her; that A.G. accused Father of molesting him; that Father and Mother admitted to seeing a photograph of A.G. performing oral sex on his younger brother J.E.; and that A.G. exhibits maladaptive sexual behaviors. Additionally, Mother repeatedly procured, violated, and dismissed protective orders against Father, allowing him access to the Children. Simply put, the sexual abuse allegations did not exist in a vacuum, as Father suggests. Rather, they were supported by independent probative evidence showing that the Children were seriously impaired or endangered and the parents were not likely to provide them with adequate protection and supervision absent the coercive intervention of the court. The trial court did not clearly err in adjudicating the Children as CHINS. Accordingly, we affirm.

[23] Affirmed.

Vaidik, C.J., and Mathias, J., concur.