## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 18 2019, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long &
Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General
Indianapolis

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of W.S. (Minor Child),

P.S. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 18, 2019

Court of Appeals Case No.
19A-JC-963

Appeal from the Bartholomew
Circuit Court

The Honorable Kelly Benjamin,
Judge

The Honorable Heather Mollo,
Magistrate

Trial Court Cause No.
03C01-1801-JC-185

**Mathias, Judge.**

[1] P.S. ("Father") appeals the Bartholomew Circuit Court's adjudication of his son, W.S. ("Child"), as a Child in Need of Services ("CHINS").[1] Father argues that the Bartholomew County Department of Child Services ("DCS") failed to prove by a preponderance of the evidence that Child is a CHINS and that no coercive intervention by the court was warranted. Finding no error on the part of the trial court, we affirm.

## Facts & Procedural History

[2] Child was born to Father and Mother on December 8, 2017, at Columbus Regional Hospital ("CRH"). Tr. pp. 6–7. Child was diagnosed at birth with a significant cleft palate and cleft lip that caused immediate concern about his ability to breathe and eat. Tr. p. 52. The palate—the roof of the mouth—separates the mouth from the sinuses and helps separate food and saliva from the airway. *Id.* A cleft palate causes the danger of aspiration, when foreign objects such as foods or liquids are inhaled into the airway. Tr. p. 62. Babies with cleft lips struggle to make a seal around a bottle in order to suck. Tr. p. 52. For these reasons, medical staff at CRH kept Child hospitalized for three weeks after his birth. Tr. p. 8. During this time, medical staff endeavored to determine the most effective way to feed Child. Tr. pp. 53–54. They used orogastric and nasogastric intubation (respectively, "OG" and "NG") and a specially

---

[1] A.S. ("Mother") did not file an Appellant's Brief, and counsel did not file an appearance on her behalf. Pursuant to Indiana Appellant Rule 17(A), however, a party of record in the trial court shall be a party on appeal.

engineered bottle. Tr. p. 53. Even experienced CRH nurses, however, struggled to use the bottle to properly feed Child. Tr. p. 53. Family physician Dr. Amanda Dornfeld ("Dr. Dornfeld") explained about the tube feeding method:

> [A]t first we used what's called an OG tube, so we put a tube from his mouth into his stomach, and then once we were sure that both sinuses were patent, we switched a couple of days later to an NG tube. . . [W]e were concerned, you know, about sending [Child] home with an NG tube [because] NG tubes can easily come out, and so if it comes out, then you have to put it back in. And if you have to put it back in, you have to understand how to do that, and you have to be sure it's in the right place, and you have to be sure you have clean and available medical tubing and medical supplies. So after really working with it, we felt we probably didn't have the resources [at CRH] to teach parents how to take care of this special feeding[.]

Tr. pp. 53–54.

[3] Eventually, it was decided that Child should be transferred to Riley Children's Hospital ("Riley") where cleft palate specialists at the Cleft and Craniofacial Clinic could provide education to Child's parents regarding tube feeding. Tr. p. 54. Parents were trained in and passed "parent care," which included verification that both Father and Mother could "place, pull, test, and feed" using an NG tube, and Child was discharged from Riley on December 21, 2017. Tr. pp. 34, 39. Child's discharge instructions were that he was to be fed by NG tube every three hours, eight times a day. Tr. pp. 10, 42. Riley medical staff also explained to parents at the time of discharge that Child would need at least two surgeries to repair his cleft lip and palate, but that the surgeries would

occur only when Child reached an adequate weight. Tr. p. 41. To that end, Child would see a local pediatrician to monitor his weight gain, and the Riley Cleft and Craniofacial Clinic would track Child's weight and progress prior to surgery. *Id.*

[4] Child arrived home after discharge from Riley on a Thursday; parents attended a follow-up appointment with Child at CRH on Friday, December 22. Tr. p. 57. The next appointment, four days later, was cancelled by parents and rescheduled for the next day, but parents did not bring Child to that rescheduled appointment. Tr. p. 58. The appointment was again rescheduled, and parents again did not show. *Id.* Concerned, Dr. Dornfeld at CRH contacted Riley:

> So at that point, I called Riley, because I knew they had an appointment with Riley on Monday [January 1, 2018], with the cleft palate clinic, and I wanted them to know if the family came, please call us [at CRH], because we wanted to get him back in our system. And I wanted them to know that we had not seen him for a week and we were concerned[.]

Tr. p. 58.

[5] On December 29, 2017, DCS received a report of potential medical neglect based on the cancelled, rescheduled, and missed appointments. Tr. p. 25. Child was not present at the Monday, January 1, 2018, appointment at Riley. *Id.* at 26. He was also not present at a rescheduled appointment at Riley on January 8, 2018. *Id.* DCS then received an additional report of medical neglect based on the missed January 8 appointment. *Id.* On January 9 and January 11, a DCS Family Case Manager ("FCM") spoke to Mother at Child's home. Tr. pp. 27–

28. Mother explained Child was being fed using a bottle because they had run out of NG feeding tubes. Tr. p. 28. At the second home visit, a DCS supervisor scheduled a same-day appointment with Child's primary care physician, Dr. Dornfeld, and the FCM accompanied Mother and Child to that appointment. Tr. p. 29.

[6] January 11 was the first time Child had received medical care since December 22, 2017, the day after he was discharged from Riley. Child was diagnosed with failure to thrive, found to be dangerously underweight, and suffering from severe diaper rash. Tr. pp. 59–60. Dr. Dornfeld admitted Child to CRH at that time, and Child was removed from the care of his parents. Tr. pp. 29–30. When the DCS FCM read parents their rights, Father reacted with confusion and stated, "[D]o what you have to do, it's not like I see him anyway." Tr. p. 30.

[7] Child has been in the care of placement Serina Roberts ("Roberts") since January 15, 2018. Tr. p. 78. A CHINS fact-finding hearing was held on March 12, 2018. At the hearing, Roberts testified that Child had had six or seven medical appointments in the two months since he had been placed in her care. *Id.* Mother attended all of the pediatrician appointments. *Id.* at 79. Parents had missed only one appointment at Riley. *Id.* Parents had not fed Child during any of these appointments, and there had been no supervised visits between Child and parents. *Id.* at 78. Roberts noted that Child's surgery was coming up on Thursday, March 15, 2018, and that post-op appointments would be "pretty much back-to-back after that, with follow-ups." *Id.* After testimony at the fact-finding hearing, the trial court adjudicated Child a CHINS and set a

dispositional hearing for April 10, 2018. Tr. p. 94. The court explained its reasoning:

> I still think the coercive intervention of the Court is needed, in particular with this young, with this child having a very important surgery coming up on Thursday, and the expectations that the follow through and the appointments will be very, absolutely just as critical for his well being and for his, for his very life.

Tr. p. 95.

[8] A dispositional hearing was held on April 10, 2018, and a fact-finding order was issued on July 10, 2018. Appellant's App. pp. 6–7. The court's dispositional order directing services for the family and continuing wardship of Child with DCS was issued on April 5, 2019. Appellant's App. p. 9. Father's timely notice of appeal was filed on April 29. Appellant's App. p. 10.

## Discussion & Decision

[9] The Fourteenth Amendment to the United States Constitution protects the fundamental right of a parent to establish a home and raise a child. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Thus, to be adjudicated a CHINS, a child must be "seriously impaired or endangered 'as a result of the inability, refusal, or neglect of the child's parent' to provide necessary care." *S.K. v. Ind. Dep't of Child Servs.*, 57 N.E.3d 878, 883 (Ind. Ct. App. 2016). The purpose of CHINS proceedings is to protect the child, not to punish the parent. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Furthermore, a

CHINS adjudication reflects the status of a child and does not establish the culpability of a particular parent. *Id.* at 105. The State of Indiana is authorized under its power of *parens patrie* to intervene when necessary to protect a child. *In re V.H.*, 967 N.E.2d 1066, 1072 (Ind. Ct. App. 2012). "The intrusion of a CHINS judgment. . . must be reserved for families who *cannot* meet [the child's] needs without coercion–not those who merely have difficulty doing so." *In re S.D.*, 2 N.E.3d 1283, 1285 (Ind. 2014).

[10] CHINS proceedings are civil in nature, and DCS must prove each element by a preponderance of the evidence. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). In reviewing the trial court's decision, we consider only the evidence that supports the trial court's decision and all reasonable inferences drawn therefrom; we reverse only upon a showing that the trial court clearly erred and will not reweigh evidence or judge witness credibility. *Id.* A decision is clearly erroneous if the evidence does not support the trial court's findings or if the trial court applied an incorrect legal standard. *In re D.J.*, 68 N.E.3d 574, 578 (Ind. 2017).

[11] Where the trial court makes findings of fact and conclusions of law in support of its determination that a child is a CHINS, we apply a two-tiered standard of review. *In re S.D.*, 2 N.E.3d at 1287. First, we consider whether the evidence supports the findings, and second, we consider whether the findings support the judgment. *Id.*

[12]    Here, the juvenile court found Child to be a CHINS pursuant to Indiana Code section 31-34-1-1. Father argues on appeal that DCS failed to prove by a preponderance of the evidence that Child's physical or mental condition was seriously impaired or endangered as a result of Father's inability, refusal, or neglect to supply Child with the necessary food, clothing, shelter, medical care, education, or supervision and that Father could not provide Child with the needed care without the coercive intervention of the court. Appellant's Br. at 4.

[13]    Father challenges whether the evidence established that Child's poor physical condition had been caused by improper feeding by Father. Appellant's Br. at 11. Specifically, Father disputes the trial court's findings that the discharge instructions provided to Father by Riley staff instructed Father to feed Child only by NG tube. *Id.* The Riley discharge nurse testified, however, that the instructions provided specified that Child should be fed only by NG tube. Tr. p. 45. Father's argument relies on the fact that staff at CRH initially instructed him and Mother to feed Child using both NG tube and bottle. Appellant's Br. at 12. Father did not object to Mother feeding Child exclusively by bottle. Tr. pp. 10, 82. Father also did not recognize that Child was not receiving sufficient nutrition despite being fed by bottle. Father did not assist in Mother's effort to obtain feeding tubes. At the time of Child's removal, Child was one month old, yet he had not gained weight—in fact, he had lost weight—and he was suspected of being malnourished. The trial court did not err in concluding that Child's physical condition was seriously endangered as a result of Father's neglect to supply Child with necessary food.

[14] Also at the time of Child's removal, Child had missed three appointments with his local pediatrician and one follow-up appointment with the specialists at Riley. Tr. pp. 26–27. Father challenges whether this evidence supports the trial court's determination that Father's inability, refusal, or neglect seriously impaired or seriously endangered Child's physical condition. Appellant's Br. at 12. Father explained that he understood the importance of follow-up appointments, but that his employment schedule had prevented him from ensuring that Child attended scheduled medical appointments. Tr. p. 83. Father testified that he did not take advantage of Medicaid transportation because he preferred to take Child to appointments himself. Tr. p. 88. The trial court heard testimony from Dr. Dornfield, explaining in reference to Child's condition when Child was belatedly seen by a doctor, that "if [Child] hadn't been found when he was found, [] he likely could have died." Tr. p. 69. Child's physical condition at the time of his removal by DCS was severe enough that he was admitted to a hospital that day. Tr. p. 29. Father did not make use of several resources provided at the time of Child's discharge from Riley specifically intended to aid Mother and Father in attending medical appointments: free Medicaid transportation, gas cards, and work excuses. Tr. p. 35. The trial court did not err in concluding that Child's physical condition was seriously endangered as a result of Father's inability, refusal or neglect to ensure Child received medical care.

[15] Finally, Father argues that the trial court erred in finding that the coercive intervention of the court was necessary because Father testified that he was

"open to cooperating with and agreeable to the services recommended by DCS," and because both parents "wanted to do whatever was necessary for Child to return home." Appellant's Br. p. 12. Father observes that we consider a family's condition not just when the case was filed, but also when it is heard, and that "doing so avoids punishing parents for past mistakes when they have already [been corrected]." *In re D.J.*, 68 N.E.3d at 580–81. Again, we stress that a CHINS determination is for the purpose of protecting a child, not punishing a parent. The trial court heard testimony from medical professionals about Child's complex and fragile physical condition, and about Father's failure to properly understand and address Child's condition. Dr. Dornfield testified that she had "real concern that [Child] could have malnourishment, failure to thrive, and even die from aspiration if he is returned to [to parents' care]." Tr. p. 69. In his appeal, Father asks us to reweigh the evidence before the trial court, which we decline to do. The CHINS statute does not require juvenile courts to "wait until tragedy occurs to intervene." *Roark v. Roark*, 551 N.E.2d 865, 872 (Ind. Ct. App. 1990).

## Conclusion

[16] The trial court's focus was appropriately on whether Father needed to be coerced into providing or accepting necessary treatment for Child. The trial court did not err in determining that Father did not demonstrate an ability to understand the severity of Child's physical needs nor an ability to consistently accept and follow through with needed medical care. In this case, the evidence clearly supports the trial court's factual findings, and the findings in turn

support the court's adjudication of Child as a CHINS. DCS proved by a preponderance of the evidence that Child's needs were unlikely to be provided for without the coercive intervention of the court. Accordingly, we affirm the trial court's adjudication of Child as a CHINS.

[17] Affirmed.

Robb, J., and Pyle, J., concur.